## LUTWAK ET AL. *v.* UNITED STATES.

No. 66.   Argued December 8–9, 1952.—Decided February 9, 1953.

*Anthony Bradley Eben* argued the cause for petitioners. With him on the brief were *Richard F. Watt* and *Joseph L. Nellis.*

*Marvin E. Frankel* argued the cause for the United States. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Murray, Beatrice Rosenberg* and *J. F. Bishop.*

MR. JUSTICE MINTON delivered the opinion of the Court.

The petitioners, Marcel Max Lutwak, Munio Knoll, and Regina Treitler, together with Leopold Knoll and Grace Klemtner, were indicted on six counts in the Northern District of Illinois, Eastern Division. The first count charged conspiracy to commit substantive offenses set forth in the remaining five counts and conspiracy "to defraud the United States of and concerning its governmental function and right of administering" the immigration laws and the Immigration and Naturalization Service, by obtaining the illegal entry into this country of three aliens as spouses of honorably discharged veterans. Grace Klemtner was dismissed from the indictment before the trial because her constitutional rights had been violated before the grand jury. At the conclusion of all the evidence, the District Court dismissed the substantive counts against all of the defendants because venue had not been shown in the Northern District of Illinois. The jury acquitted Leopold Knoll and convicted the three petitioners on the conspiracy count. The Court of Appeals affirmed, 195 F. 2d 748, and we granted certiorari, 344 U. S. 809.

We are concerned here only with the conviction of the petitioners of the alleged conspiracy. Petitioner Regina Treitler is the sister of Munio Knoll and Leopold Knoll,

and the petitioner Lutwak is their nephew. Munio Knoll had been married in Poland in 1932 to one Maria Knoll. There is some evidence that Munio and Maria were divorced in 1942, but the existence and validity of this divorce are not determinable from the record. At the time of the inception of the conspiracy, in the summer of 1947, Munio, Maria and Leopold were refugees from Poland, living in Paris, France, while Regina Treitler and Lutwak lived in Chicago, Illinois. Petitioner Treitler desired to get her brothers into the United States.

Alien spouses of honorably discharged veterans of World War II were permitted to enter this country under the provisions of the so-called War Brides Act which provides in pertinent part:

> ". . . notwithstanding any of the several clauses of section 3 of the Act of February 5, 1917, excluding physically and mentally defective aliens, and notwithstanding the documentary requirements of any of the immigration laws or regulations, Executive orders, or Presidential proclamations issued thereunder, alien spouses or alien children of United States citizens serving in, or having an honorable discharge certificate from the armed forces of the United States during the Second World War shall, if otherwise admissible under the immigration laws and if application for admission is made within three years of the effective date of this Act, be admitted to the United States . . . ." 59 Stat. 659, 8 U. S. C. § 232.

The first count of the indictment charged that the petitioners conspired to have three honorably discharged veterans journey to Paris and go through marriage ceremonies with Munio, Leopold and Maria. The brothers

and Maria would then accompany their new spouses to the United States and secure entry into this country by representing themselves as alien spouses of World War II veterans. It was further a part of the plan that the marriages were to be in form only, solely for the purpose of enabling Munio, Leopold and Maria to enter the United States. The parties to the marriages were not to live together as husband and wife, and thereafter would take whatever legal steps were necessary to sever the legal ties. It was finally alleged that the petitioners conspired to conceal these acts in order to prevent disclosure of the conspiracy to the immigration authorities.

The conspiracy to commit substantive offenses consisted in that part of the plan by which each of the aliens was to make a false statement to the immigration authorities by representing in his application for admission that he was married to his purported spouse, and to conceal from the immigration authorities that he had gone through a marriage ceremony solely for the purpose of gaining entry into this country with the understanding that he and his purported spouse would not live together as man and wife, but would sever the formal bonds of the ostensible marriage when the marriage had served its fraudulent purpose.

The statute defining conspiracy reads as follows:

> "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both." 18 U. S. C. (1946 ed.) § 88, now 18 U. S. C. (Supp. V) § 371.

The sections of the statute which it was alleged the petitioners conspired to violate provide in pertinent part:

"Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall be guilty of a misdemeanor and, upon conviction, shall be punished by imprisonment for not more than one year or by a fine of not more than $1,000, or by both such fine and imprisonment." 45 Stat. 1551, 8 U. S. C. § 180a.

"Whoever knowingly makes under oath any false statement in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, shall, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both." 43 Stat. 153, 165, 8 U. S. C. (1946 ed.) § 220 (c), now 18 U. S. C. (Supp. V) § 1546.

From the evidence favorable to the Government, the jury could reasonably have believed that the following acts and transactions took place, and that the petitioners conspired to bring them about. Lutwak, a World War II veteran, was selected to marry Maria Knoll, his aunt by marriage. He went to Paris where he went through a marriage ceremony with Maria. They traveled to the United States, entering the port of New York on September 9, 1947. They represented to the immigration authorities that Maria was the wife of Lutwak, and upon that representation Maria was admitted. They never lived together as man and wife, and within a few months Munio and Maria commenced living together in this

country as man and wife, holding themselves out as such. Lutwak, in the meantime, represented himself to friends as an unmarried man. Lutwak and Maria were divorced on March 31, 1950.

Lutwak and Mrs. Treitler also found two women— Bessie Benjamin Osborne and Grace Klemtner—who were honorably discharged veterans of World War II, and who were willing to marry Munio and Leopold so that the brothers could come to the United States. Bessie Osborne was introduced to Treitler by Lutwak, and went to Paris accompanied by Treitler. There she went through a pretended marriage ceremony with Munio Knoll, and on their arrival at New York City, Munio was admitted on November 13, 1947, on the representation that he was married to Bessie Osborne. The marriage was never consummated and was never intended to be. The parties separated after entering the United States, and they never lived together as husband and wife at any time. Bessie Osborne's suit for divorce from Munio was pending at the time of the trial.

Still later, Grace Klemtner, who was also a World War II veteran and an acquaintance of Regina Treitler, went to Paris and went through a pretended marriage ceremony with Leopold. They then traveled to the United States, where Leopold was admitted on December 5, 1947, upon the representation that he was the husband of Grace Klemtner. They immediately separated after their entry into this country, and they never lived together as husband and wife at any time until about the time Grace Klemtner appeared before the grand jury which returned the indictment. This was approximately April 1, 1950, more than two years after the marriage ceremony in Paris. Bessie Osborne and Grace Klemtner received a substantial fee for participating in these marriage ceremonies.

There is an abundance of evidence in this record of a conspiracy to contract spurious, phony marriages for the

purposes of deceiving the immigration authorities and thereby perpetrating a fraud upon the United States, and of a conspiracy to commit other offenses against the United States.

Petitioners present three principal contentions: (1) Their conspiracy was not unlawful because the marriages involved were valid marriages; (2) the trial court erred in permitting the ostensible wives of these marriages to testify against their so-called husbands; and (3) the trial court erred in admitting testimony of various acts and declarations of different petitioners, done and said after the conspiracy had ended, without limiting the evidence to the particular defendant who performed the act or made the statement.

## I.

At the trial, it was undisputed that Maria, Munio and Leopold had gone through formal marriage ceremonies with Lutwak, Bess Osborne and Grace Klemtner, respectively. Petitioners contended that, regardless of the intentions of the parties at the time of the ceremonies, the fact that the ceremonies were performed was sufficient to establish the validity of the marriages, at least until the Government proved their invalidity under French law. They relied on the general American rule of conflict of laws that a marriage valid where celebrated is valid everywhere unless it is incestuous, polygamous, or otherwise declared void by statute. See *Loughran* v. *Loughran*, 292 U. S. 216, 223; Restatement, Conflict of Laws, §§ 121, 132–134. Neither side presented any evidence of the French law, and the trial court ruled that in the absence of such evidence, the French law would be presumed to be the same as American law. The court later instructed the jury that "if the subjects agree to a marriage only for the sake of representing it as such to the outside world and with the understanding that they will put an end to

it as soon as it has served its purpose to deceive, they have never really agreed to be married at all." The petitioners claim that the trial court erred in presuming that the French law relating to the validity of marriages is the same as American law, and they further contend that even under American law these marriages are valid.

We do not believe that the validity of the marriages is material. No one is being prosecuted for an offense against the marital relation. We consider the marriage ceremonies only as a part of the conspiracy to defraud the United States and to commit offenses against the United States. In the circumstances of this case, the ceremonies were only a step in the fraudulent scheme and actions taken by the parties to the conspiracy. By directing in the War Brides Act that "alien spouses" of citizen war veterans should be admitted into this country, Congress intended to make it possible for veterans who had married aliens to have their families join them in this country without the long delay involved in qualifying under the proper immigration quota. Congress did not intend to provide aliens with an easy means of circumventing the quota system by fake marriages in which neither of the parties ever intended to enter into the marital relationship; that petitioners so believed is evidenced by their care in concealing from the immigration authorities that the ostensible husbands and wives were to separate immediately after their entry into this country and were never to live together as husband and wife. The common understanding of a marriage, which Congress must have had in mind when it made provision for "alien *spouses*" in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations. Such was not the case here, or so the jury might reasonably have found. Thus, when one of the aliens stated that he was married, and omitted to explain the true nature of his marital

relationship, his statement did, and was intended to, carry with it implications of a state of facts which were not in fact true.

Because the validity of the marriages is not material, the cases involving so-called limited-purpose marriages,[1] cited by petitioners to support their contention that the marriages in the instant case are valid, are inapplicable. All of those cases are suits for annulment in which the court was requested to grant relief to one of the parties to a marriage on the basis of his own admission that the marriage had been a sham. Where the annulment was denied, one or more of the following factors influenced the court: (1) A reluctance to permit the parties to use the annulment procedure as a quick and painless substitute for divorce, particularly because this might encourage people to marry hastily and inconsiderately; (2) a belief that the parties should not be permitted to use the courts as the means of carrying out their own secret schemes; and (3) a desire to prevent injury to innocent third parties, particularly children of the marriage. These factors have no application in the circumstances of the instant case. Similarly inapplicable are the cases where a marriage was entered into in order to render the wife incompetent to testify against her husband in a pending trial, because in none of those cases was it proved that the parties to the marriage did not intend to enter into the marital relationship in good faith.[2] Much more closely related is the case of *United States* v. *Rubenstein*, 151 F. 2d 915, 918–919, in which the court held that where

---

[1] *E. g., Schibi* v. *Schibi*, 136 Conn. 196, 69 A. 2d 831; *Hanson* v. *Hanson*, 287 Mass. 154, 191 N. E. 673. These and the other cases cited by petitioners are collected and discussed in a note, 14 A. L. R. 2d 624 (1950).

[2] *E. g., Norman* v. *State*, 127 Tenn. 340, 155 S. W. 135; *State* v. *Frey*, 76 Minn. 526, 79 N. W. 518.

two persons entered into a marriage solely for the purpose of facilitating the woman's entry into this country, and with no intention by either party to enter into the marriage relationship as it is commonly understood, for the purposes of that case they were never married at all. In the instant case, as in the *Rubenstein* case, there was no good faith—no intention to marry and consummate the marriages even for a day. With the legal consequences of such ceremonies under other circumstances, either in the United States or France, we are not concerned.

## II.

Much of the evidence of the conspiracy comes from the lips of the so-called wives of these spurious marriages. The next question with which we are confronted is whether these so-called wives are competent to testify against their purported husbands in this criminal prosecution and thus incriminate the so-called husbands.

Civil marriage ceremonies were entered into by the parties in Paris as above indicated. Must these ostensible marriages be recognized as creating spouses in order that the marital relationship may be claimed to prevent the wives from testifying against the husbands? At common law the wife could testify neither for nor against her husband in a criminal case, but since *Funk* v. *United States,* 290 U. S. 371, the wife may testify in favor of the husband.

A review in the *Funk* case of the cases in this Court revealed the inconsistencies of the rule which made a wife incompetent to testify on *behalf* of her husband, and this Court resolved the question in favor of competency. The *Funk* case left the rules of evidence as to the competency of witnesses to be formulated by the federal courts or Congress in accordance with reason and experience. *Wolfle* v. *United States,* 291 U. S. 7, 12.

There followed the promulgation by this Court of Rule 26 of the Federal Rules of Criminal Procedure, which reads as follows:

"RULE 26. EVIDENCE.

". . . The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

This rule was a paraphrase of Mr. Justice Stone's statement in *Wolfle,* at 12.

Under this rule, the competency of witnesses is to be governed by the principles of the common law as they *may be* interpreted by the courts in the light of reason and experience. The governing principles are not necessarily as they had existed at common law. Congress has not acted, and has specifically authorized this Court to prescribe rules of criminal procedure, but the rules do not specifically answer the problem here. Therefore, it is open to us to say whether we shall go further and abrogate this common-law rule disqualifying one spouse from testifying in criminal cases *against* the other spouse.

When the good faith of the marital relation is pertinent and it is made to appear to the trial court, as it was here, that the relationship was entered into with no intention of the parties to live together as husband and wife but only for the purpose of using the marriage ceremony in a scheme to defraud, the ostensible spouses are competent to testify against each other. Here again, we are not concerned with the validity or invalidity of these so-called marriages. We are concerned only with the application of a common-law principle of evidence to the circumstances of this case. In interpreting the common law in this instance, we are to determine whether

"in the light of reason and experience" we should interpret the common law so as to make these ostensible wives competent to testify against their ostensible husbands. The reason for the rule at common law disqualifying the wife is to protect the sanctity and tranquility of the marital relationship. It is hollow mockery for the petitioners in arguing for the policy of the rule to invoke the reason for the rule and to say to us "the husband and wife have grown closer together as an emotional, social, and cultural unit" and to speak of "the close emotional ties between husband and wife" and of "the special protection society affords to the marriage relationship." In a sham, phony, empty ceremony such as the parties went through in this case, the reason for the rule disqualifying a spouse from giving testimony disappears, and with it the rule.

> "It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." *Funk* v. *United States, supra,* at 383.

The light of reason and experience do not compel us to so interpret the common law as to disqualify these ostensible spouses from testifying in this case. We therefore hold that in the circumstances of this case, the common-law rule prohibiting antispousal testimony has no application. These ostensible wives were competent to testify.

### III.

Most of the evidence in this case consisted of testimony of the acts and declarations of the defendants. The petitioners contend that because some of these acts and declarations took place after the conspiracy ended, they were erroneously admitted without being properly limited to the defendant who did the act or made the statement

testified to. We must, therefore, decide when the conspiracy ended. The petitioners contend it ended when the last of the parties, Leopold Knoll, was admitted to the United States on December 5, 1947. Then and there, they say, the fraud if any was complete, and the conspiracy to violate the statutes was complete. The Government contends that a part of the conspiracy was an agreement among the conspirators to conceal their fraud by any means, and so it was alleged in the indictment.

But there is no statement in the indictment of a single overt act of concealment that was committed after December 5, 1947, and no substantial evidence of any. Such acts as were set forth and proved were acts that revealed and did not conceal the fraud. Therefore, there is no evidence in the record to establish as a part of the conspiracy that the conspirators agreed to conceal the conspiracy by doing what was necessary and expedient to prevent its disclosure. There was a statement of Munio Knoll in the record to one witness Haberman that indicated Munio's purpose to cover up and conceal the conspiracy. This is not evidence that the conspiracy included the further agreement to conceal. It is in the nature of an afterthought by the conspirator for the purpose of covering up. The trial court so understood it, and this statement of Munio Knoll, as testified to by Haberman, was limited by the Court as applicable against Munio Knoll only.

This Court in *Krulewitch* v. *United States,* 336 U. S. 440, rejected the Government's contention that in every conspiracy there is implicit an agreement as a part thereof for the conspirators to collaborate to conceal the conspiracy.

"The rule contended for by the Government could have far-reaching results. For under this rule plausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in

evidence tended to shield co-conspirators. We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence." *Id.*, at 444.

While the concealment was alleged in this indictment as a part of the conspiracy, it was not proved. We think on this record that the conspiracy ended December 5, 1947.

It does not necessarily follow that acts and declarations made after the conspiracy ended are not admissible. In this case, the essential fact of the conspiracy was the existence of phony marriage ceremonies entered into for the sole purpose of deceiving the immigration authorities and perpetrating a fraud upon the United States. *Acts* which took place after the conspiracy ended which were relevant to show the spuriousness of the marriages and the intent of the parties in going through the marriage ceremonies were competent—such as the fact that the parties continued to live apart after they came to the United States; that money was paid the so-called wives as a consideration for their part in the so-called marriages; and that suits were started to terminate whatever legal relationship there might have been upon the record.

Declarations stand on a different footing. Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party. *Clune* v. *United States*, 159 U. S. 590, 593. See *United States* v. *Gooding*, 12 Wheat. 460, 468–470. But such declaration can be used against the co-conspirator only when made in furtherance of the conspiracy. *Fiswick* v. *United States*, 329 U. S. 211, 217; *Logan* v. *United States*, 144 U. S. 263, 308–309. There can be no furtherance of

a conspiracy that has ended. Therefore, the declarations of a conspirator do not bind the co-conspirator if made after the conspiracy has ended. That is the teaching of *Krulewitch* v. *United States, supra,* and *Fiswick* v. *United States, supra.* Those cases dealt only with declarations of one conspirator after the conspiracy had ended. They had no application to *acts* of a conspirator or others which were relevant to prove the conspiracy. True, there is dictum in *Logan* v. *United States, supra,* at 309, frequently repeated, which would limit the admissibility of both acts and declarations to the person performing them. This statement of the rule overlooks the fact that the objection to the declarations is that they are hearsay. This reason is not applicable to acts which are not intended to be a means of expression. The *acts,* being relevant to prove the conspiracy, were admissible, even though they might have occurred after the conspiracy ended. *United States* v. *Rubenstein,* 151 F. 2d 915, 917–918; see *Fitzpatrick* v. *United States,* 178 U. S. 304, 312–313; *Ferris* v. *United States,* 40 F. 2d 837, 839.

Relevant declarations or admissions of a conspirator made in the absence of the co-conspirator, and not in furtherance of the conspiracy, may be admissible in a trial for conspiracy as against the declarant to prove the *declarant's* participation therein. The court must be careful at the time of the admission and by its instructions to make it clear that the evidence is limited as against the declarant only. Therefore, when the trial court admits against all of the conspirators a relevant declaration of one of the conspirators after the conspiracy has ended, without limiting it to the declarant, it violates the rule laid down in *Krulewitch.* Such declaration is inadmissible as to all but the declarant.

In the trial of a criminal case for conspiracy, it is inevitable that there shall be, as there was in this case, evidence as to declarations that is admissible as against

all of the alleged conspirators; there are also other declarations admissible only as to the declarant and those present who by their silence or other conduct assent to the truth of the declaration. These declarations must be carefully and clearly limited by the court at the time of their admission and the jury instructed as to such declarations and the limitations put upon them. Even then, in most instances of a conspiracy trial of several persons together, the application of the rule places a heavy burden upon the jurors to keep in mind the admission of certain declarations and to whom they have been restricted and in some instances for what specific purpose. While these difficulties have been pointed out in several cases, *e. g., Krulewitch* v. *United States, supra,* at 453 (concurring opinion); *Blumenthal* v. *United States,* 332 U. S. 539, 559–560; *Nash* v. *United States,* 54 F. 2d 1006, 1006–1007, the rule has nonetheless been applied. *Blumenthal* v. *United States, supra; Nash* v. *United States, supra; United States* v. *Gottfried,* 165 F. 2d 360, 367.

In our search of this record, we have found only one instance where a declaration made after the conspiracy had ended was admitted against all of the alleged conspirators, even though not present when the declaration was made.[3] Was the admission of this one item of hearsay evidence sufficient to reverse this case?

We think not. In view of the fact that this record fairly shrieks the guilt of the parties, we cannot conceive how this one admission could have possibly influenced this jury to reach an improper verdict. A defendant is entitled to a fair trial but not a perfect one. This

---

[3] R. 208–209. Bessie Osborne testified: "I asked when action would be taken for divorce, and [Munio Knoll] asked me if I would wait two years because he wanted to become an American citizen, and it would take that long, and I agreed to wait." This hearsay statement attributed to Munio was admitted against all the defendants.

is a proper case for the application of Rule 52 (a) of the Federal Rules of Criminal Procedure.[4] We hold that the error was harmless.

Finding no reversible error in this record, the judgment is

*Affirmed.*

Mr. Justice Jackson, whom Mr. Justice Black and Mr. Justice Frankfurter join, dissenting.

Whenever a court has a case where behavior that obviously is sordid can be proved to be criminal only with great difficulty, the effort to bridge the gap is apt to produce bad law. We are concerned about the effect of this decision in three respects.

1. We are not convinced that any crime has been proved, even on the assumption that all evidence in the record was admissible. These marriages were formally contracted in France, and there is no contention that they were forbidden or illegal there for any reason. It is admitted that some judicial procedure is necessary if the parties wish to be relieved of their obligations. Whether by reason of the reservations with which the parties entered into the marriages they could be annulled may be a nice question of French law, in view of the fact that no one of them deceived the other. We should expect it to be an even nicer question whether a third party, such as the state in a criminal process, could simply ignore the ceremony and its consequences, as the Government does here.

We start with marriages that either are valid or at least have not been proved to be invalid in their inception. The Court brushes this question aside as immaterial, but we think it goes to the very existence of an

---

[4] "(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

offense. If the parties are validly married, even though the marriage is a sordid one, we should suppose that would end the case. On the other hand, if the marriage ceremonies were for some reason utterly void and held for naught, as if they never had happened, the Government could well claim that entry into the United States as married persons was fraud. But between these two extremes is the more likely case—marriages that are not void but perhaps voidable. In one of these cases, the parties (on the trial) expressed their desire to stay married, and they were acquitted; and no one contends that their marriage is void. Certainly if these marriages were merely voidable and had not been adjudged void at the time of the entry into this country, it was not a fraud to represent them as subsisting. We should think that the parties to them might have been prosecuted with as much reason if they had represented themselves to be single. Marriages of convenience are not uncommon and it cannot be that we would hold it a fraud for one who has contracted a marriage not forbidden by law to represent himself as wedded, even if there were grounds for annulment or divorce and proceedings to that end were contemplated.

The effect of any reservations of the parties in contracting the marriages would seem to be governed by the law of France. It does not seem justifiable to assume what we all know is not true—that French law and our law are the same. Such a view ignores some of the most elementary facts of legal history—the French reception of Roman law, the consequences of the Revolution, and the Napoleonic codifications. If the Government contends that these marriages were ineffectual from the beginning, it would seem to require proof of particular rules of the French law of domestic relations.

2. "The federal courts have held that one spouse cannot testify against the other unless the defendant spouse

waives the privilege. . . ." *Griffin* v. *United States,* 336 U. S. 704, 714, and cases cited. The Court condones a departure from this rule here because, it says, the relationship was not genuine. We need not decide what effect it would have on the privilege if independent testimony established that the matrimonial relationship was only nominal. Even then, we would think the formal relationship would be respected unless the trial court, on the question of privilege, wanted to try a collateral issue. However, in this case, the trial court could only conclude that the marriage was a sham from the very testimony whose admissibility is in question. The Court's position seems to be that privileged testimony may be received to destroy its own privilege. We think this is not allowable, for the same reason that one cannot lift himself by his own bootstraps.

3. We agree with the Court that the crime, if any, was complete when the alien parties obtained entry into the United States on December 5. We think this was the necessary result of the holding in *Krulewitch* v. *United States,* 336 U. S. 440. This requires rejection of the Government's contention that every conspiracy includes an implied secondary conspiracy to conceal the facts. This revival of the long-discredited doctrine of constructive conspiracy would postpone operation of the statute of limitations indefinitely and make all manner of subsequent acts and statements by each conspirator admissible in evidence against all. But, while the Court accepts the view of *Krulewitch,* we think its ruling on subsequent acts and declarations largely nullifies the effect of that decision and exemplifies the dangers pointed out therein.

For present purposes, we need not maintain that no admission or act of a conspirator occurring after the conspiracy has accomplished its object is admissible against a co-conspirator. And we do not question that at times

such evidence is admissible against the actor or speaker alone. But one of the additional leverages obtained by the prosecution through proceeding as for conspiracy instead of as for the substantive offense is that it may get into evidence against one defendant acts or omissions which color the case against all.

This case is a vivid illustration of that process in action. The statement of facts in the Government's brief is punctuated by eight separate footnotes to explain that the testimony recited in the text was limited to one or another defendant. We doubt that any member of this Court, despite our experience in sifting testimony, can carry in mind what was admitted against whom, and we are confident the jury could not. We will not prolong this opinion with an analysis of this testimony. Some of it was very damaging. For example, testimony was admitted, limited to Munio Knoll, that on one occasion he returned to his apartment and had difficulty getting in. When he gained admittance, petitioner Lutwak was going out through the window, leaving Knoll's wife to explain the phenomenon if she could. This testimony was not admitted against Lutwak, and the jury was adequately warned not to use it against him. But does anybody believe that the jury could forget that picture of Lutwak being caught taking hasty leave of his co-conspirator's wife and making a somewhat irregular exit? The salutary rule that evidence of acts which occurred long after the conspiracy terminated is admissible only against particular defendants should be observed in spirit as well as in letter. Here much of such evidence was of such remote probative value, and the instruction limiting its use was so predictably ineffectual, that its admission violated a substantial right of those defendants against whom it could not be used.

For these reasons we are impelled to dissent.