218 So.2d 551

**STATE of Louisiana**

**v.**

**John T. HOPPER and Joe A. Woodard.**

**No. 48170.**

Jan. 20, 1969.

Rehearing Denied Feb. 24, 1969.

Gravel & Doggett, Alexandria, for defendants-appellants.

Jack P. F. Gremillion, Atty. Gen., William P. Schuler, Harry H. Howard, Asst. Attys. Gen., for plaintiff-appellee.

McCALEB, Justice.

This is a sequel to State of Louisiana v. John Hopper and Joe Woodard, 251 La. 77, 203 So.2d 222, wherein we affirmed defendants' convictions of manslaughter and sentences to serve fifty months at hard labor in the state penitentiary on an indictment charging them with murder of Joseph Beeson. The matter is now before us pursuant to a decree of the Supreme Court of the United States, vacating said judgment and remanding the case to this Court " * * * for further consideration in light of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, and Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100, decided June 10, 1968." 392 U.S. 658, 88 S.Ct. 2281, 20 L.Ed.2d 1347.

■ Bruton was jointly charged and tried with one Evans in a federal district court for armed postal robbery, and both defendants were convicted by the jury. During the trial a postal inspector testified that Evans confessed to him that he and Bruton committed the robbery. The United States Court of Appeals for the Eighth Circuit set aside Evans' conviction on the ground that his oral statement should not have been received in evidence because the police officers, to whom Evans had confessed prior to the giving of his statement to the postal inspector, had not given Evans preliminary warnings of any kind in compliance with the guidelines set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974. However, Bruton's conviction was affirmed since the trial judge had instructed the jury that Evans' confession was to be disregarded in determining Bruton's guilt or innocence. The Supreme Court granted certiorari on application of Bruton and held that, despite instructions to the jury to disregard the implicating statement of Evans in determining the guilt or innocence of Bruton, admission at the joint trial of a codefendant's extrajudicial confession violated Bruton's right of cross-examination under the confrontation clause of the Sixth

Amendment to the United States Constitution.[1]

The Bruton decision specifically overruled the Court's 1957 holding in Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278, and was made retroactive thereafter in the Roberts case.

In the case at bar, Joe Woodard and John Hopper, 20 and 21 years of age respectively, were students at Louisiana Tech in Ruston. They had come to Marksville, along with two other students, where they secured a room at the Ranch House Motel upon their arrival, and then went to the Pelican Club on the Saturday night in question. Following the incident occurring at the Pelican Club which led to the instant prosecution, the two defendants were examined separately and orally confessed to the killing of Beeson. Major Henderson first questioned Woodard in the presence of Deputy Bordelon, Chief Dubea and with the District Attorney present during part of the questioning. Thereafter, Major Henderson questioned Hopper in the presence of the coroner, Dr. Kaufman, and Chief Dubea. Major Henderson took notes during the questioning, reducing the defendants' oral confessions to writing in which each implicated the other in the act

under investigation, as well as himself, but neither defendant signed the statements. These confessions are quoted in full in our original opinion. See State v. Hopper, 251 La. 77, 203 So.2d 222 at pages 103–111 of the Louisiana Reports and at pages 232–234 of the Southern Reporter.

Woodard's statement was to the effect that he and his codefendant had been dancing and drinking at the Pelican Club, and while there, Beeson, the deceased, and a young man named Jimmy Nobles had a few words, the latter accusing Beeson of taking some of his whiskey. John Hopper saw Beeson pouring himself a drink from the fifth he had bought and told him not to drink his whiskey. When Hopper later saw Beeson take another drink, he became angry. Woodard then stated, "By the way they were acting I thought they were going out side to fight. They left where they were and started out side." He and some others followed and saw Hopper and Beeson "standing by the truck arguing like they were going to fight. * * * Just before I got there the deceased hit Johnny (Hopper) on the side of the head with a glass. I then ran up and grabbed the deceased. I was holding him and Johnny hit him once or twice while he was standing

1. This Amendment, which provides in part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * * ", is made applicable to the States by the Fourteenth Amendment. Pointer v.

Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923; Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934; and Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100.

up. We then pushed him down between the concrete slab and the Truck. Then we both hit him 4 or 5 times each while he was down. Most of the blows landed on the head. I then kicked him on the side of the head. Johnny hit him a couple of times on the head after I kicked him. Then we saw a whole lot of blood on the concrete slab." Upon observing the blood they ran to where the car was parked and immediately returned to the motel with their friends.

Hopper stated in substance that they had been drinking and dancing at the Pelican Club, and he noticed on one or two occasions when he returned to his table after dancing that some of his whiskey would be missing. There were two other boys at the table and, when Hopper and his friends got ready to go, these boys got up, all leaving together. Hopper stated further that, "One of the boys started talking as we walked out. We were leaning on one another. I mean the boy who turned out to be Beeson. We kept walking toward the outside and when we got outside I asked him if he had been getting any whiskey off the table. We stopped walking and started facing each other. I then heard some one coming up from behind. I turned around to see who it was then Beeson hit me on the left side of my head with a glass or bottle. I don't know what it was. I automatically turned and started hitting him. I don't know what all happen. I remember hitting him after he hit me with

the glass. The next thing I remember he was down and I was hitting him in the face with my fist. When I got up Joe (Woodard) jumped back. I then said let's go get in the car and get out of here." They returned to their quarters at the Ranch House Motel where they were when the police arrived and Hopper hid in a closet "because I was scared."

It is seen from the foregoing that this case is *factually* distinguishable from the Bruton case in that, here, both defendants recounted the happenings of the fatal night in substantially identical statements in which they admitted their guilt by reciting orally the occurrences of the affray before, during and after commission of the crime. The statements, which we have outlined above, reveal a joint assault and battery on Beeson allegedly precipitated by the latter's abstraction of whiskey out of defendants' bottle, which led to the fight assertedly commenced by Beeson striking Hopper when he turned around to see who was approaching him from behind. This culminated in the administration of blows by both defendants upon the person of Beeson who was struck down and beaten to death.

However, under the Bruton decision, the reciprocal incriminating statements herein, insofar as each confessor detailed the criminal conduct of the other, were hearsay and inadmissible against his codefendant at the joint trial despite the cautionary instruc-

tions of the judge to the jury to disregard the reciprocally implicating statements and, since neither defendant elected to take the witness stand, the confession of each implicating the other was a technical deprivation of the nonconfessor's constitutional right to confrontation. Hence, it would be in order to reverse the convictions and remand the case for separate trials were it not for the all-important circumstance that each defendant voluntarily admitted in his separate statement the same criminal conduct recited in the statement of his codefendant.

■ When we view the case under the circumstances here presented, we find a technical violation of constitutional rights which, in our estimation, did not injure or prejudice either defendant before the jury in any significant way or deprive either of a fair trial. And that was all to which defendants were entitled. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593. Even though the members of the jury might not have been able to disassociate each confessor's inculpation of his codefendant in determining the latter's guilt (notwithstanding the instructions by the judge), this caused no injury to the rights of each nonconfessor forasmuch as each nonconfessor had himself confessed and subscribed to the same criminal conduct related by the other defendant in his confession. In other words, it appears to us that it is an overplay of constitutional rights to an unrealistic proportion for each to plead denial of his right of cross-examination anent his activity on the fatal night when he admits in his own extrajudicial declaration the identical acts attributed to him in the hearsay statement. See United States ex rel. Catanzaro v. Mancusi, decided by the United States Court of Appelas for the Second Circuit on December 2, 1968, 404 F.2d 296.

Article 921, Code of Criminal Procedure, provides:

"A judgment or ruling shall not be reversed by any appellate court *on any ground* unless in the opinion of the court after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the *substantial* rights of the accused, or constitutes a *substantial* violation of a constitutional or statutory right." (Italics ours)

■ It is accordingly seen we are not required to reverse a judgment of conviction unless the trial error constitutes a *substantial* violation of a constitutional right or that the accused has otherwise been prejudiced. Here, as we have above stated, we are of the opinion that the deprivation of each defendant's constitutional right was insubstantial and inconsequential *factually* since each defendant suffered no prejudice in view of his own incriminating admissions that the crime was committed

in the same manner and under the same circumstances as stated by his codefendant.

Considering then this case in the light of the Bruton decision, as we are directed to do by the Supreme Court, we feel that the conclusion we have reached is in conformity with the basic principle on which that pronouncement is founded. For in holding that the Delli Paoli doctrine could no longer be followed in the context of cases like Bruton, the Supreme Court was concerned principally with the doubtful effectiveness of cautionary instructions by the judge to the jury that a codefendant's confession inculpating the other codefendant had to be disregarded in determining the latter's guilt or innocence. The Court noted that it had been recognized in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205, that there are some contexts in which the risk that the jury will not, or cannot, follow such cautionary instructions is so great " * * * and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." And, after proclaiming that such a context was presented in Bruton, where the incriminating extrajudicial statements of the codefendant standing side by side with the other accused are deliberately spread before the jury in a joint trial, the Court concluded that, " * * * Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence in-

culpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination."

Here, however, in the context of the circumstances presented, we have the codefendants' admissions standing side by side with each confessor acknowledging in his own confession the same criminal conduct ascribed to him by the other. The hearsay statements are corroborated by each codefendant's extrajudicial statement or vice versa. Under such a situation, it is wholly unnecessary to speculate whether the cautionary instructions of the judge may not have effectively prevented the jury from disassociating each confessor's inculpation of his codefendant in determining the latter's guilt. For, as we see it, the hearsay caused no injury and did not deprive either defendant of a *substantial* constitutional right because, if each defendant had taken the stand, it is difficult to perceive what benefit either could have gained by cross-examining the other anent the same criminal conduct to which each had already voluntarily confessed extrajudicially.

We have assiduously examined this case from all aspects and are persuaded that the joint trial of the defendants has been fair in every respect. In fine, defendants have no defense; in concert they committed a vicious crime to which they separately and

voluntarily confessed their guilt in detailed statements inculpating each other. Under the circumstances presented herein, we hold that the ruling in Bruton v. United States does not require that defendants' convictions be reversed and a new trial granted.

For the reasons assigned, our original opinion affirming the convictions and sentences herein is reinstated as the final judgment of this Court.

FOURNET, Chief Justice (dissenting).

This case was originally assigned to me but failing to receive the approval of the majority of the court to the opinion I had prepared, the case was then assigned to the author of the majority opinion. Inasmuch as that opinion fully presents my views I submit the same as a dissenting opinion in this case followed by my criticism of the majority opinion.

FOURNET, Chief Justice.

This is a sequel to the case of State of Louisiana v. John Hopper and Joe Woodard, 251 La. 77, 203 So.2d 222, wherein we affirmed defendants' conviction of manslaughter and sentence to serve 50 months at hard labor in the state penitentiary on an indictment charging them with murder of Joseph Beeson. The matter is now before us pursuant to a decree of the Supreme Court of the United States, vacating said judgment and remanding the case to this court "for further consideration in the light of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, and Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100, decided June 10, 1968," 392 U.S. 658, 88 S.Ct. 2281, 20 L.Ed. 2d 1347.

In the former case in reversing Bruton's conviction for armed postal robbery, having been jointly tried with one Evans,[1] whose confession implicating Bruton was admitted into evidence over Bruton's objection and who did not take the stand, the Supreme Court reversed Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278, and held that despite instructions to the jury to disregard the implicating statements in determining the guilt or innocence of Bruton, admission at the joint trial of codefendant's extrajudicial confession implicating him violated Bruton's right of cross-examination guaranteed under the confron-

---

1. Bruton and Evans were convicted in the district court and during the trial a postal inspector testified that Evans confessed to him that he and Bruton committed the robbery. The Court of Appeal for the Eighth Circuit set aside Evans' conviction on the ground that his oral confession should not have been received into evidence for it followed a confession to the St. Louis police wherein he was not given preliminary warning and in the absence of counsel. The appellate court upheld Bruton's conviction because the trial judge had instructed the jury that Evans' confession had to be disregarded in determining Bruton's guilt or innocence.

tation clause of the Sixth Amendment.[2] This decision was made retroactive in the Roberts case.

In the case at bar Joe Woodard and John Hopper, 20 and 21 years respectively, were students at Louisiana Tech in Ruston and had come to Marksville, along with two other students, getting a room at the Ranch House Motel upon their arrival and then going to the Pelican Club on the Saturday night in question. Following the incident leading to the instant prosecution that occurred at the Pelican Club the two defendants were examined separately with Major Henderson first questioning Woodard in the presence of Deputy Bordelon, Chief Dubea and with the district attorney present during part of the questioning. Thereafter, Major Henderson questioned Hopper in the presence of the coroner, Dr. Kaufman, and Chief Dubea. Major Henderson took notes during the questioning, reducing the defendants' oral confessions to writing in which each implicated the other in the act under investigation, as well as himself, but neither defendant signed the statements.

Woodard's statement was to the effect that he and his codefendant had been dancing and drinking at the Pelican Club, and while there, Beeson, the deceased, and a

boy named Jimmy Nobles had a few words, the latter accusing Beeson of taking some of his whiskey. John Hopper saw Beeson pouring himself a drink from the fifth he had bought and told him not to drink his whiskey. When Hopper later saw Beeson take another drink, he became angry. Woodard then stated, "By the way they were acting I thought they were going outside to fight. They left where they were and started outside." He and some others followed and saw Hopper and Beeson "standing by the truck like they were going to fight. * * * Just before I got there the deceased hit Johnny (Hopper) on the side of the head with a glass. I then ran up and grabbed the deceased. I was holding him and Johnny hit him once or twice while he was standing up. We then pushed him down between the concrete slab and the truck. Then we both hit him 4 or 5 times each while he was down. Most of the blows landed on the head. I then kicked him on the side of the head. Johnny hit him a couple of times on the head after I kicked him. Then we saw a lot of blood on the concrete slab." Upon observing the blood they ran to where the car was parked and immediately returned to the motel with their friends.[3]

---

2. Amendment 6, United States Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

3. Woodard's statement was introduced as State exhibit No. 10.

Hopper in effect stated that they had been drinking and dancing at the Pelican Club and he noticed on one or two occasions when he returned to his table after dancing that some of his whiskey would be missing. There were two other boys at the table and when Hopper and his friends got ready to go these boys got up, all leaving together. Hopper stated further that, "One of the boys started talking as we walked out. We were leaning on one another. I mean the boy who turned out to be Beeson. We kept walking toward the outside and when we got outside I asked him if he had been getting any whiskey off the table. We stopped walking and started facing each other. I then heard someone coming up from behind. I turned around to see who it was, then Beeson hit me on the left side of my head with a glass or bottle. I don't know what it was. I automatically turned and started hitting him. I don't know what all happen. I remember hitting him after he hit me with the glass. The next thing I remember he was down and I was hitting him in the face with my fist. When I got up Joe (Woodard) jumped back. I then said let's go get in the car and get out of here."

They all returned to the Ranch House Motel.[4]

In response to a bill of particulars filed by the defendants the State indicated that the only statements made by the defendants were oral, but that Major Henderson had made written notes and gave copies of the unsigned statements to counsel for the defendants. Defendants then filed a motion to suppress these statements and "any evidence, testimonial or physical, including any statement, admission or confession, of any kind", which, after a hearing was denied. Thereafter each filed a motion for severance, alleging, in addition to the contention that his defenses were antagonistic to and contradictory with those of his co-defendant, that Mover's co-defendant made a statement outside of his presence which the State will use against Mover in the prosecution of this cause." Each defendant reserved a bill of exception following the overruling of his motion and also when the statements were introduced into evidence over their objection. They also reserved bills of exception when certain other admissions and/or confessions allegedly made by them were admitted into evidence over their objection.[5]

---

4. Hopper's statement was introduced as State Exhibit No. 11.

5. a) Chief Dubea testified that when he went to the motel to arrest the suspects he asked Woodard if it was his car that was parked outside and he said, "Yes, sir." He also responded affirmatively when he asked him, "Were you in a fight at the Pelican?" Chief Dubea then informed him the boy was dead to which he testified Woodard responded, "We knew we had given him a good beating but we didn't know we had killed him."

b) Trooper Bordelon testified that he and Trooper Lemoine went to the motel to pick up Hopper and that Lemoine en-

Counsel for defendants contend, as stated in their brief, that the accused are "reciprocally aggrieved by denial of cross-examination under the Confrontation Clause not only as to State's Trial exhibit Number 10 and 11 (the unsigned statements) but also by the other extrajudicial statements and/or confessions (footnote 5) appearing throughout the record in the testimony before the jury, in the prosecution's opening statement and in his closing argument to the jury. Defendants steadfastly maintain that they were each entitled to severance in order to escape the prejudicial effect of the co-defendant's out-of-court statements and they maintain that they were each denied cross-examination to the extent that each incriminating statement or confession implicated the non-declarant defendant. Additionally, they each maintain that the trial judge's instructions to the jury—not to consider the confession of one defendant against the other—is an inadequate substitute for their right of cross-examination under the Confrontation Clause of the Sixth Amendment."

On the other hand, counsel for the State contends that the Bruton case is not controlling here for the statements of the defendants are "substantially similar, mutually inculpating and noncontradictory" and therefore "precludes the 'substantial threat and serious flaw' of the Bruton and Roberts decisions that would otherwise arise under the Confrontation Clause of the Sixth Amendment of the United States Constitution." In the alternative, it is urged "that if, under the Bruton ruling constitutional error exists in that Hopper was denied the right to cross-examine Woodard on Woodard's confessions and Woodard was denied the right to cross-examine Hopper on Hopper's confessions, it is respectfully submitted under the flexibility allowed by the Bruton ruling * * * that harmless error rule should be applied in the instant case

tered the motel room first and he heard Lemoine ask him if he had been to the Pelican Club, if he had had trouble there, and if he had been in a fight, to which he answered to each, "Yes." He then advised him he was under arrest—the Sheriff's office wanted him for murder. Hopper said, "Oh, my God, what have we done."

c) Mrs. Duncan, mother of the victim, testified that when she reached the radio room of the sheriff's office there were a number of people she did not know, except one, and she heard him inform her brother-in-law, who was with her, "Ralph (Beeson) is dead, these fellows killed him." Hopper was seated across the desk from where she was seated and she could see Woodard seated in the next room. She testified she looked at the Hopper boy and said, "Why?" and he shrugged his shoulders and said, "Just drunk."

d) Reverend John Bell testified that while in jail to administer to those needing spiritual assistance he was in the hallway adjacent to the cells and overheard a conversation between the defendants and a third unidentified party in which he heard Woodard say, "I wish to hell that I had had time to stomp another one to death."

as set forth in Art. 921 of the Louisiana Code of Criminal Procedure." [6]

While the court in the Bruton case did recognize that "not every admission of inadmissible hearsay or other evidence can be considered to be reversible error * *" and " 'A defendant is entitled to a fair trial but not a perfect one'," in its final conclusion observed, *"Here the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore.* Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial *we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination.* The effect is the same as if there had been no instruction at all." (Emphasis added.)

Under our rules of procedure in the trial of criminal cases in this state as prescribed in Article 921 of the Code of Criminal Procedure, reproduced in full in footnote 6, the appellate court is precluded from reversing a judgment or ruling of a lower court unless in the opinion of the court

the error complained of (1) "has probably resulted in a miscarriage of justice," (2) "is prejudicial to the substantial rights of the accused," *or* (3) *"constitutes a substantial violation of a constitutional or statutory right."*

Under the facts of this case by the admission of the defendants' respective statements, which were made outside of the presence of his co-defendant, and with neither defendant having taken the witness stand, the defendants were deprived of their right of cross-examination, a right guaranteed under the confrontation clause of the Constitution of this state,[7] and the 6th Amendment of the United States Constitution which is applied to the states by the provisions of the 14th Amendment thereof, which is unquestionably a substantial right.

This poses for our consideration, therefore, the issue raised by the State in its alternative plea that the error, if any under the particular facts of this case is harmless, claiming that the statement of each defendant was simply to relate his version of what took place during the incident in question and are "substantially similar, mutually inculpating and noncontradictory"

6. Art. 921, Code of Criminal Procedure: "A judgment or ruling shall not be reversed by an appellate court on any ground unless in the opinion of the court after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right."

7. Art. 1, Sec. 9, provides: " * * * The accused in every instance shall have the right to be confronted with the witnesses against him; * * *."

thereby precluding the "substantial threat and serious flaw" of the Bruton case. Counsel cite in support thereof a decision of a court of original jurisdiction in New York, People v. DeVine, Sup., 293 N.Y.S. 2d 691.

In the DeVine case the defendant, who had been convicted nine years prior, sought a new trial, claiming he was denied the right of confrontation when the confession of his co-defendant was introduced as evidence against his co-defendant and his own confession introduced against him. While the confessions are not available to us, the court found, "That in all respects the confessions of both defendants are one and the same, each admitting full complicity in every respect," and concluded, "Neither Bruton nor cases involving conflicting 'cross-implication confessions' apply here."

While such decisions may be persuasive, they are not controlling. In any event, the DeVine case is inapposite factually.

In the case at bar hearsay statements of the two defendants were introduced as their respective confessions and the jury was properly instructed by the judge that the statement of one could not be considered against the other, which was the accepted rule of law of this state until the decision of the United States Supreme Court in the Bruton case. Undoubtedly, the statement of each defendant clearly infringed upon his co-defendant's right of

confrontation and we are unable to say that the instructions to disregard the confession of one in determining the guilt or innocence of the other made the constitutional error "harmless beyond a reasonable doubt" within the meaning of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. As observed in the latter case, there is an intention "not to treat as harmless those constitutional errors that 'affect substantial rights' of a party," as in such cases there is "cast on someone other than the person prejudiced by it a burden to show that it was harmless, * * * to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment."

If we must follow the Bruton case, where it was clearly stated, "Despite the concededly clear instructions to the jury to disregard Evan's inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination," we have no alternative but to overrule the defendants' conviction and sentence in this case.

I do not agree that the harmless error rule is applicable in carrying out the holding of the Bruton case for I cannot conceive of a more substantial and important right that was ever accorded an individual under the common law rule of England adopted by our several states and guaranteed by the Constitution of the United

States and the several state constitutions than that of confrontation of witnesses against him. But conceding that the rule does apply for purposes of argument, I cannot agree with the holding of the majority that "When we view the case under the circumstances presented, we find a technical violation of constitutional rights which, in our estimation, did not injure or prejudice either defendant before the jury in any significant way or deprive either of a fair trial. * * * Even though the members of the jury might not have been able to disassociate each confessor's inculpation of his codefendant in determining the latter's guilt (notwithstanding the instructions by the judge), this caused no injury to the rights of each nonconfessor forasmuch as *each nonconfessor had himself confessed and subscribed to the same criminal conduct related by the other defendant in his confession.*" (Emphasis added.)

As it appears in the foregoing and from the innumerable similar statements to be found throughout the majority opinion to the same effect, such as, that "both defendants recounted the happenings of the fatal night *in substantially identical statements in which they admitted their guilt* * * *" which " * * * reveal a joint assault and battery on Beeson * * *," it can be readily seen that the whole decision is based on a false premise when

considered in the light of the defendants' statements. (Emphasis added.)

A cursory examination of the statements of the two defendants will immediately show they are not identical or that "each nonconfessor had himself confessed and subscribed to the same criminal conduct related by the other defendant in his confession." Woodard relates in his statement when Hopper saw Beeson pouring a drink from the 5th he had bought and later saw him taking another drink he became angry and "by the way they were acting I thought they were going outside to fight," whereas Hopper in the beginning of his statement portrays a different picture. While he does state when returning to his table after dancing that some of his whiskey was missing, he does not imply therein that a fight was contemplated when he left with his friends and two boys (one being Beeson) that had been at their table for according to his version as they walked out (Beeson and he) were "leaning on one another." I do not think it could be questioned that it was a natural impulse of self-preservation for Hopper to strike back when, without warning, he was struck on the side of the head by Beeson with a glass or bottle while he was looking the other way. He was justified in self-defense to do as he stated, "I automatically turned and started hitting him." Moreover, I fail to find any words or combination of words in Hopper's state-

ment or confession from which it can be deduced that he was hitting Beeson while the latter was being held by Woodard or to show that he struck the deceased, as stated by Woodard, after Woodard had kicked Beeson in the head, nor, as found by the majority, that there was "a joint assault and battery on Beeson", but rather the statement reflects it was a spontaneous reaction on his part after being struck by the deceased with a glass or bottle.

Under the situation presented here, I, therefore, cannot agree as held in the majority opinion, "It is wholly unnecessary to speculate whether the cautionary instructions of the judge may not have effectively prevented the jury from disassociating each confessor's inculpation of his codefendant in determining the latter's guilt." I have no illusions of the prejudicial effect Woodard's statement had on the jury in considering Hopper's case. Moreover, I do not believe that what does or does not constitute a substantial violation of a constitutional or statutory right should be determined by a trial judge or jury. In my opinion there can be no "insubstantial and inconsequential" violation of a constitutional right.

It is apt to observe that each defendant filed a motion for severance, alleging, in addition to the contention that his de-

fenses were antagonistic to and contradictory with those of his co-defendant that "Mover's co-defendant made a statement outside of his presence which the State will use against Mover in the prosecution of this cause." In my opinion this motion should have been granted.

For the foregoing reasons, I respectfully dissent.

BARHAM, Justice (dissenting).

The Louisiana Constitution[1] and the United States Constitution[2] establish the right of an accused to be confronted with the witnesses against him. In Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278, it was held that in the trial of those jointly accused the admission of one defendant's pretrial statement or confession did not violate the other defendant's right to confrontation, on the theory that a jury would follow the clear instructions of the judge to disregard one defendant's statement in considering the guilt or innocence of the other. The recent case of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, specifically overruled that jurisprudence, stating: " * * * we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination * * *." The Su-

---

1. La.Const. of 1921, Art. 1, Sec. 9: " * * * The accused in every instance shall have the right to be confronted with the witnesses against him * * *."

2. U.S.Const. Amend. VI: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

preme Court in that case concluded that a judge's instructions to disregard this hearsay evidence as to the other accused does not in fact erase that evidence from the jurors' minds in their deliberations over that accused's guilt or innocence, and that the admission of such evidence is a denial of his right to confrontation of all witnesses against him.

In Bruton only one of two defendants had confessed, and that confession was used in the trial of the codefendants. In the present case both defendants gave statements, both statements were admitted and used in trial, and the trial judge charged the jury that each defendant's statement should be disregarded in determining the guilt or innocence of the other. The majority refuses to apply the rule of Bruton v. United States here upon the theory that the cases are distinguishable upon their facts: Whereas Bruton in-

volved the confession of one codefendant, in the instant case each accused made inculpatory statements, and according to the majority " * * * each defendant voluntarily admitted in his separate statement the same criminal conduct recited in the statement of his codefendant".[3]

I disagree with the majority's conclusion that these two statements admit the same criminal conduct. The statements reflect different views, different facts, and different degrees of culpability and criminality. The recitals of the statement of Hopper, one of the defendants,[4] standing alone, might in the minds of a jury exonerate him from any criminal responsibility under a plea of self-defense. Certainly, when his statement is considered alone, he was justified at the beginning of the fracas in repelling a battery committed by the deceased upon him—contrary to the majority's finding that his statement, like

3. See United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296 (C.C.A.2 1968), which apparently refused to apply Bruton because Catanzaro himself confessed and his confession interlocked with and supported the confession of the codefendant. That court theorized that where the jury has heard not only the codefendant's confession but the defendant's own confession, the lack of confrontation is not prejudicial, and that Bruton does not apply. This decision, of course, is not binding upon us, but in any event I believe the holding erroneous and contrary to the law of Bruton.

4. This statement pertinently reads: " * * * One of the boys started talking as we walked out. We were leaning on one another. I mean the boy who

turned out to be Beeson [the deceased]. We kept walking toward the outside and when we got outside I asked him if he had been getting any whiskey off the table. We stopped walking and started facing each other. I then heard some one coming up from behind. I turned around to see who it was then Beeson hit me on the left side of my head with a glass or bottle. I don't know what it was. I automatically turned and started hitting him. I don't know what all happen. I remember hitting him after he hit me with the glass. The next thing I remember he was down and I was hitting him in the face with my fist. When I got up Joe [Woodard] jumped back. I then said let's go get in the car and get out of here."

Woodard's, " * * * reveal[s] a joint assault and battery * · * *" on the deceased. To be fair, one must conclude that under the facts related by Hopper's statement a jury could return a verdict of not guilty by determining that Hopper used no more force than was necessary to repel the battery. However, Woodard's statement is that he held the deceased while Hopper hit him, that they both pushed him down and struck him several times on the head, that Woodard then kicked him on the head and Hopper continued to strike him thereafter, leaving " * * * a whole lot of blood on the concrete slab". This statement is totally damning of the conduct of both defendants and takes away from Hopper's statement any exculpatory effect. To say under these circumstances that the statement reflects the same criminal conduct and, more particularly, that Woodard's statement was not prejudicial to Hopper, is an erroneous judgment on the facts. However, as I will discuss later, I am of the opinion that the "harmless error" doctrine requiring a showing of prejudice is inapplicable, and I will therefore not ground this dissent upon the above factual distinction.

Nevertheless, even if the statements of these codefendants were similar in all respects, we must remember that more than the mere contents of a statement or the bare facts related by a witness impresses

and weighs upon the minds of the jurors. The law as well as human experience recognizes that facts which are repeated may carry greater weight than those related by one witness only. A codefendant's pretrial statement which is greatly similar to and even supportive of the accused's own pretrial inculpatory statement tends to verify and add weight to those inculpatory recitals and is additional evidence against the accused in the minds of the jury. Also, an accused has a right to recant a pretrial statement and often does, but such a recantation will be of little benefit if he is deprived of the right to effectually attack a codefendant's pretrial statement through confrontation and cross-examination. Therefore, even under the facts found by the majority the admission of the codefendants' statements without the right of confrontation is obvious prejudice which would remove this case from the harmless error rule.

The majority has erred by applying to this case the Louisiana rule for harmless error set out in Article 921 of our Code of Criminal Procedure. We are here concerned with the violation of a federal as well as a state constitutional guarantee, and it is firmly established that in such cases the federal harmless error rule must be applied. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.[5] The state rule under which the majority has acted

5. See also Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171.

says that reversal will not be had on any ground unless " * * * it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or *constitutes a substantial violation of a constitutional or statutory right*". (Emphasis supplied.) The federal rule enunciated by the United States Supreme Court, which is applicable to this case, does not require a showing of prejudice if a *substantial constitutional right* has been abrogated. It is not the nature or extent of the violation which is controlling, but it is only the nature of the right denied which is to be considered. As is said in Chapman · v. California, supra, " * * * there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error * * * ".[6]

Since the harmless error doctrine as enunciated by the United States Supreme Court may not be invoked when a substantial federal constitutional right has been denied, it is necessary only to determine whether the right to confrontation of witnesses is so essential to a fair trial that it ·is, like such guarantees as the right to

counsel, the right to trial by jury in certain circumstances, the right to be informed of the charge, a substantial right. The right to confront the accusing witnesses, if not the most important requirement in a criminal trial, is certainly an essential right and a substantial constitutional guarantee, deprivation of which invalidates a conviction without a requirement that prejudice be shown. In such a situation prejudice is to be presumed, and one need not speculate as to just what benefit confrontation and cross-examination might have availed the accused. Bruton v. United States, supra, having determined that the judge's instruction to disregard is not an acceptable substitute for the right of confrontation, and the right of confrontation being a substantial right, under the facts found by the majority this case should be reversed and remanded without an inquiry into the question of prejudice or harmless error.

I therefore respectfully dissent.

Rehearing denied.

FOURNET, C. J., and BARHAM, J., are of the opinion a rehearing should be granted.

---

6. See, for example, Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (coerced confession); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (right to counsel); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (impartial judge).