250 So.2d 394 (1971)
259 La. 436
STATE of Louisiana
v.
Frank HILLS.
No. 50909.
Supreme Court of Louisiana.
June 28, 1971.
*395 Charles O. Simmons, Jr., O. Romaine Russell, Baton Rouge, for defendant-appellant.
Jack P. F. Gremillion, Atty. Gen., Harry H. Howard, Asst. Atty. Gen., Sargent Pitcher, Jr., Dist. Atty., Ralph L. Roy, Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
Appellant Frank Hills was indicted for aggravated rape. He was tried, found guilty without capital punishment and sentenced to life imprisonment.
Thirteen bills of exceptions were reserved, all of which are relied upon in this appeal except Bills 10, 11, and 12, these three having been abandoned.
About 3 o'clock on the morning of December 3, 1966 the prosecutrix Janice Wallace and her ten children were asleep in their home at 917 Myrtle Street in the city of Baton Rouge. The prosecutrix's husband was away at work in Lafayette. Shortly thereafter she was awakened by a movement on her bed. She turned to face a colored male who grabbed her arm and held a metal object she believed to be a knife to her throat. He threatened her and warned her against any outcry, all the while holding the object to her throat and holding her left arm while her right arm *396 was pinned beneath her. The assailant then raped her. When the act was consummated, the assailant left by the front door.
Immediately after his departure, the police were summoned. Investigation disclosed that the assailant entered the house through a rear unlocked window to which access was gained by a ladder.
By questioning the prosecutrix it was ascertained that a lighted gas, radiant heater was near her bed at the time of the assault. By the light of the exposed flame she saw the rapist clearly, retaining until trial a vivid impression of his facial features.
Sixteen days later, during the early morning hours of December 19, a Negro man broke into a residence at 917 Napoleon Street, three blocks from the Myrtle Street address of the Wallace residence. He got into bed with a seven-year-old girl who awakened to find that the man had removed her clothing. He offered her money and threatened her if she cried out.
Later that morning when the child related the incident to her mother, the mother discovered muddy foot tracks on the child's bed sheet, on the floor and at a window through which the intruder passed to enter the house. A wallet containing identification cards, papers and a driver's license, with his picture, all belonging to appellant Frank Hills, was found near the heater in the room where the child slept. An address book belonging to Frank Hills was also found near the child's bed. These objects were delivered to the police.
Entrance into this house was gained by the intruder through the rear, and he departed from the front of the house.
Some time prior to these incidents, a Negro man entered the Biondo residence in the early morning hours about six or eight blocks away. A teenage girl who was asleep at the time was disturbed by someone pulling the covers and fondling her. She awoke to find a Negro man in her bed. He threatened that if she uttered an outcry he would kill her, and he then propositioned her offering money for her consent to sexual intercourse. Notwithstanding the threats and inducements the girl declared she would scream and the man fled.
Investigation disclosed a window screen had been slit on the side of the house, and the front door, which had been locked, was ajar. The girl's purse, like that of her mother and sister, had been rifled. Suit-cases which had been packed for a trip to New Orleans the next day had also been tampered with. A coat and money were missing.
Two weeks before Christmas 1966 the Biondo residence was again burglarized and a pea coat belonging to a young boy of the Biondo family was stolen. The pea coat was later found in Frank Hills' residence.

I.
At the trial the prosecuting officer declared in his opening statement that he would present evidence of similar offenses other than the offense charged to prove system, mode of operation, guilty knowledge and intent, to which defense counsel objected. Like objection was made during the trial to the introduction of evidence of the other incidents which we have narratedthe incident of the seven-year-old child and the young Biondo girl and the introduction of the objects found or stolen on those occasions. To preserve this issue for review, defense counsel reserved and perfected Bills 1, 2, 3, 5 and 6 which he argues on this appeal.
Intent is not an element of the crime of aggravated rape the defense contends and, therefore, error occurred when the trial judge permitted the introduction of evidence of other similar acts to prove intent. La.Crim.Code art. 42. This contention is without merit.
Criminal conduct involves acts combined with criminal intent, acts and failure to act *397 which produce criminal consequences not requiring criminal intent and criminal negligence which produces criminal consequences. La.Crim.Code art. 7. It does not follow from these definitions, however, that intent is not relevant to criminal conduct producing criminal consequences where there is no requirement of specific criminal intent.
All "acts" which produce criminal consequences involve an exercise or refusal to exercise a bodily function. Action or failure to act are external manifestations of the will of the party, unless the action or failure to act is induced by forces beyond the will of the actor. The point is made in the reporter's comment to Article 8 of the Criminal Code as follows:
* * * * * *
All positive conduct includes at some point a voluntary muscular movement (external manifestations of will) which we call an act. See Restatement of the law of Torts (1934) § 2. To illustrate briefly, the muscular movement of pulling the trigger of a gun would be an "act." The bullet's hitting some object would be "consequences." The act must be willed, so that if another person seized the hand of the accused and squeezed it and the trigger, or if the accused had a convulsion and lost control of his muscles, there would be no voluntary muscular movement on the part of the accused, and therefore no crime, even though someone was hit and died. However, as we know, if the act of pulling the trigger was willed by the accused and fatal consequences followed which were not willed, the accused might still be responsible, because consequences relate to intent, and one of the concepts of intent set out in the following articles might insure his responsibility.
* * * * * *
The intent referred to in the foregoing quotation may be either specific or general. La.Crim.Code art. 10. The intent which is pertinent here is general criminal intent which exists "when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." It is distinguished from specific intent in that specific intent requires proof that the consequence was intended; whereas, in crimes where no specific intent is required it is only necessary to prove the "act" was intended.
Intent, therefore, is a relevant consideration in any "act" producing "criminal consequences," even though there was no specific intent that criminal consequences would follow. "Relevant evidence is that tending to show the commission of the offense and the intent or tending to negative the commission of the offense and the intent * * *." La.R.S. 15:441. Thus "Facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact" are admissible. La.R.S. 15:441.
Section 445 of Title 15 of the Revised Statutes declares that "In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it may be inferred from the circumstances of the transaction." This authority permits, as the trial judge ruled, the activity of this accused involving the seven-year-old girl and the Biondo teenager to be shown in order to dispel any inference that his actions with the victim Janice Wallace were not his voluntary actsthat is, similar acts were relevant to show the accused was no stranger to such actions and was, therefore, not forced into the main action, or insensible of its occurrence. In short, the similar occurrences help to establish that the "act" complained of was willed or intended. Added to this is the legal presumption which our law supports that the defendant intended the natural and probable consequences of his act. La. R.S. 15:432. Evidence to support this *398 presumption of intent is also relevant. See La.R.S. 15:441.
In each of the incidents, including that involving Janice Wallace which is the subject of this prosecution, the assailant was a Negro man, the early morning hours were the times he chose; entry was made from a rear window and the intruder exited through a front door. In each incident he threatened the victim and offered money. All three assaults were closely related in point of time and all occurred in the same neighborhood. All occurrences were in fact similar, and from the evidence available all involved the defendant Frank Hills.
This Court has repeatedly held that in sexual offenses, such as rape, evidence of similar recent acts of the defendant is admissible to show intent. State v. Bolden, 257 La. 60, 241 So.2d 490 (1970); State v. Crook, 253 La. 961, 221 So.2d 473 (1969); State v. Ferrand, 210 La. 394, 27 So.2d 174 (1946); State v. Cupit, 189 La. 509, 179 So. 837 (1938); State v. Mischiro, 165 La. 705, 115 So. 909 (1928); State v. Fuller, 164 La. 718, 114 So. 606 (1927); State v. McCollough, 149 La. 1061, 90 So. 404 (1922); State v. Wichers, 149 La. 643, 89 So. 883 (1921); State v. DeHart, 109 La. 570, 33 So. 605 (1903).

II.
Defense counsel contends the trial judge erred in allowing the introduction of the wallet found in the seven-year-old girl's bedroom because it could not be identified by the girl's mother who found it. The child's mother testified that when she found the wallet she had never seen it before. When she found the wallet she observed that it contained a driver's license of Frank Hills. At the trial she identified the wallet with the driver's license as the one she picked up on the morning of the assault upon her child.
The sufficiency of the identification is a question of fact for the determination of the trial judge only insofar as the relevancy of the object sought to be introduced is concerned. The effect to be given to the identification and its sufficiency otherwise concerns the weight to be given to the evidence by the jury. In this case, the identification was sufficient to permit the wallet's introduction.

III.
Defense counsel contends a bed sheet containing blood and seminal fluid purportedly taken from the bed occupied by the seven-year-old girl on the night she was assaulted was improperly introduced into evidence. The error, it is urged, involved the prosecution's failure to establish that the sheet was at all times in the possession of particular persons who did not tamper with it and who did not grant third persons access to the sheet. In short, a proper chain of custody was not established.
The mother testified the officers took the sheet from the bed on the morning in question. Detective Tycer verified that he was present when the sheet was removed from the bed, and he placed the sheet in an envelope which he marked in his handwriting. When he removed the sheet from the bed, he submitted it to Officer Cox, the evidence officer, who, in turn, submitted it to the crime lab. Mr. Travis Owens, a criminologist with the Louisiana State Police Crime Lab, identified the sheet and the envelope, both of which bore case numbers assigned by him. While the sheet was in the laboratory he analyzed the sheet stains as blood and seminal fluid remnants.
A sufficient chain of custody was established to permit the admission of the sheet in evidence. There is no showing that the sheet was tampered with while in police custody. Only by conjecture and speculation can we sustain a contention that third parties were granted access to the evidence or that it had been tampered with. A clear preponderance of the evidence is sufficient *399 on a question of admissibility. Moreover, the objection is more properly addressed to the weight to be accorded to the evidence. State v. Square, 257 La. 743, 244 So.2d 200 (1971); State v. Coleman, 254 La. 264, 223 So.2d 402 (1969).

IV.
Detective Robert M. Tycer testified during the trial that he obtained a search warrant to search the defendant's residence at 850 South 13th Street in the city of Baton Rouge and that neither the original nor his copies of the warrant or affidavit supporting its issue could be found. For this reason the defense objected to any testimony in connection with the search and seizure. The objection was overruled on the basis that the search warrant and supporting affidavit were lost documents, and testimony as to their contents could be established by secondary evidence. Bill 9 was reserved to this ruling.
Only Detective Tycer's uncorroborated statement that he had obtained a search warrant and that it was lost stands to support the fact. He testified that he entered defendants residence with defendant's landlord and seized a screwdriver and the pea jacket to which we have referred.
The pea jacket had previously been identified at the trial by the Biondo girl as the one taken from her residence. No motion to suppress the objects seized had been made prior to trial and no motion to suppress was made during trial. Furthermore, no argument is made in brief that defendant was unaware of the unconstitutional search and seizure until the trial was in progress. La.Code Crim.Proc. art. 703. There is serious doubt, therefore, that we should overrule the trial judge on his fact determination that a search warrant had issued and was lost. Doubt is also cast upon the validity of this bill because the pea jacket was previously identified by the Biondo girl in connection with her testimony and had been exhibited to the jury as the jacket stolen from the Biondo residence. All of these factors illustrate emphatically that the procedure prescribed by Article 703 of the Code of Criminal Procedure for suppressing evidence obtained as a result of an unconstitutional search and seizure has not been observed.[1]
*400 Despite these obvious shortcomings, seriously affecting the merits of this bill, and assuming arguendo that the search and seizure was unconstitutional, as having been made without a warrant and without permission, we are of the opinion that the ruling permitting introduction of testimony referring to the fact that the pea jacket was found in defendant's residence was harmless error.
Our harmless error rule is embodied in Article 921 of the Code of Criminal Procedure in these terms:
A judgment or ruling shall not be reversed by an appellate court on any ground unless in the opinion of the court after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right.
This article sets forth the basic concept of appellate review and is the primary legislative mandate governing appeals. The idea is that appeals are not granted merely to test the correctness of the trial judge's ruling, but only to rectify an injury caused thereby. State v. Saia, 212 La. 868, 33 So. 2d 665 (1948). This harmless error concept has been a legislative mandate in this State since 1928.
In 1967 the United States Supreme Court gave the doctrine added meaning when it recognized its possible application even where federal constitutional error had occurred. Mr. Justice Black writing for the majority said:
We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for "errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111. None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules. All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction. (Chapman v. California, 386 U.S. 18, 21, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 [1967]).
We are of the opinion that this case presents a situation contemplated by the Court in the Chapman Case, and the error which occurred here, if any, was harmless under the rationale of Article 921 of the Code of Criminal Procedure. We are not denied the right to apply this harmless error doctrine in the face of constitutional error in the light of Chapman v. California.
The evidence to support the conviction without admitting the pea coat was overwhelming *401 and untainted. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The strongest type of positive evidence identified defendant as the rapist of Janice Wallace. Discovery of his driver's license with his photograph in the seven-year-old girl's bedroom and the other facts we have recited support a finding of overwhelming proof of guilt, the evidence concerning the pea coat being merely cumulative. Our judgment is based on our own reading of the record and on what seems to us to have been the probable impact of the seizure of the pea coat in defendant's residence on the minds of an average jury. Harrington v. California, supra; Commonwealth v. Padgett, 428 Pa. 229, 237 A.2d 209 (1968).
The design of the exclusionary rule growing out of illegal searches and seizures since Mapp v. Ohio is to bring about a deterrent effect upon police officers who would violate the constitutional guarantees against unreasonable searches and seizures. Refusal to reverse a conviction of a defendant, because of the admission of illegally seized evidence, where other evidence conclusively demonstrates his guilt, is not going to lessen police sensitivity to the exclusionary rule, thereby reducing its deterrent effect.
This bill is without merit.

V.
Bill 13 was reserved by defendant to the trial court's refusal to grant a mistrial. Reliance is placed upon those provisions of Article 775 of the Code of Criminal Procedure which declare that a "mistrial may be ordered, and in a jury case the jury dismissed, when * * * (3) there is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law. * * *"
Thus, the argument proceeds, testimony and evidence was introduced flowing from a search and seizure, the legality of which the State failed to prove in the manner required by law. Our discussion of the search and seizure question in Part IV of this opinion and our conclusion that the error, if any, in this case was harmless disposes of this contention.
The conviction and sentence are affirmed.
DIXON, J., dissented.
TATE, Justice (dissenting).
The writer respectfully dissents.
The accused was convicted of aggravated rape. Undoubtedly, the assailant of the fine lady so victimized should be punished. The accused is a bad man, at least presumptively a child molester and a burglar.
Why, then, should the dissenting justices demur from affirmance of the conviction, no matter how strained the grounds? Perhaps a brief summary of the grossly unfair prosecution evidence may indicate that the conviction must be reversed to assure a fair trial and a fair opportunity for a jury to determine whether this accused is guilty of the crime charged. The bulk of the evidence at the present trial is irrelevant to such determination.
The accused is charged with raping Janice Wallace at 3 a. m. on December 3, 1966. She testified as to the rape. In court, she identified the accused as her assailant.
This seems a simple enough case for the jury's determination. Either the jury believes Mrs. Wallace's identification (for there is no other evidence connecting the defendant with the scene or the date or the crime), or it does not. What more is there to the case?
This is the serious question: What more is there to the case? Why did not the prosecution simply put on this evidence and rest (or else secure further evidence more firmly connecting the defendant with the scene or the crime), instead of putting *402 on the grossly prejudicial and irrelevant evidence I shall refer to shortly?
The reason why the prosecution did not put on a better case as to the Wallace rape of December 3 is, the record seems to indicate, because it could not.
The key to the prosecution's misuse of evidence of other offenses lies in the lack of really connective evidence. It is also probably indicated by the observation of the detective to whom the victim complained within an hour of the rape: "* * she gave us what you might consider a vague description because of poor lighting inside the place."[1] Tr. 277.
Supposedly to prove that the defendant raped Mrs. Wallace, the only further evidence put on by the prosecution concerned two dissimilar and non-related offenses:
(1) Two weeks after the Wallace rape (on December 19th) a man awakened a seven-year old girl who lived three blocks away from Mrs. Wallace. The little girl was sleeping in her bed with her two brothers. The man offered her money and told her he would kill her if she screamed. He took off her bottom clothes. The little girl replied, "No, sir", to both questions, "He didn't touch you with his hands?" and "Did he touch you?" Tr. 292. Seminal stains were found on the sheet muddied by the assailant's presence. The accused is at least connected with this repulsive crime, because his wallet and driver's license were found under the little girl's bed,[2] although the crime is obviously dissimilar in nature and method to the Wallace rape.
(2) Two weeks before the Wallace rape (on November 19th), a college girl was awakened by someone pulling her bedclothes off. This Negro man was fully clothed. He offered her five dollars and told her he would hurt her if she screamed. The girl said she was going to scream whether he hurt her or not. The man asked her not to scream and left. The girl admitted she could not identify her assailant, and no effort was made to tie in this assailant with the defendant, sitting just a few feet away as the girl testified.
This totally irrelevant incident, dissimilar also in method to the offense charged,[3] was apparently introduced in evidence because of the circumstance that a pea-coat, stolen in a second burglary of the college-girl's residence almost a month later than her attempted rape, was found in the defendant's room when it was searched after his address was found under the little girl's bed on December 19th. The finding of the pea-coat may, if unexplained, connect the defendant to this second burglary; it has no probative value in connecting the accused to the attempted rape of the college-girl a month earlier, and no connection whatsoever with the Wallace rape two weeks earlier.
The unauthorized search and seizure of the defendant's room after the incident of December 19th deserves a word of comment. The detective, who had seized the pea-coat (which tended to identify the defendant as connected with or having received goods stolen in a burglary completely unrelated to the rape charged), testified that he had done so by virtue of a search-warrant obtained from some unknown district judge. The search-warrant was never produced.
It was not proved that the detective actually obtained a search-warrant. The partner with whom he worked the case was not even called to corroborate his testimony *403 that one had been obtained, and the police records division officer testified there was "no record" of any search-warrant, Tr. 354. Yet the detective was permitted to testify concerning the seizure on his own blithe testimony that the return must have been lost because he had returned it to the unknown judge, just seven months before the trial of June, 1967.
The presentation of the prosecution's case, I must regretfully say, represents an effort to obtain a conviction at any cost, no matter how irrelevant or inadmissible the grossly prejudicial evidence introduced. Essentially, after the weak identification of the accused by the victim, the prosecution sought to prove not that he was the perpetrator of the rape but that he was a bad, bad man.
I do not doubt he may be. In America, however, evolving through the thousand years of prior legal history upon which our concept of justice is based, our principle is that we send a person to the penitentiary because of proof that he has committed the crime with which charged, not simply because he is an obnoxious or even evil individual.
The majority more or less admits that the stolen pea-coat was improperly admitted into evidence, being the product of an illegal warrantless search. It characterizes such admission as harmless error.
The error cannot be harmless. In the first place, as noted, the proof of guilt of the crime for which convicted is equivocal, not overwhelming. Further, in Chapman v. California, 318 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the very case relied upon by the majority, the Supreme Court stated that, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt". 318 U.S. 24, 87 S.Ct. 828. To do so, the appellate court must determine that the error made no contribution to conviction. 318 U.S. 26, 87 S.Ct. 824.
Under the majority's rationale, this cannot be done. The majority apparently believes that the pea-coat, stolen in a burglary on a later occasion, somehow connects the defendant with an attempted rape four weeks earlier by an unidentified man of a college-girl living at the same residence as that from which the pea-coat was stolen, which the majority feels somehow is relevant to prove that the defendant committed the present rape two weeks later some six to eight blocks distant. If the college-girl rape is indeed relevant, and if the pea-coat is indeed relevant, then its introduction is highly prejudicial as inferentially proving (!), so the majority finds, that the defendant committed both rapes.
The present dissent has just attempted to demonstrate on a common-sense factual basis that the present conviction results from the admission of improper evidence and in proceedings fraught with unfairness. I concur in my brother BARHAM's scholarly dissent setting forth the legal reasons of error.
In summary, grossly prejudicial and irrelevant evidence of other crimes (with one of which the accused is not even shown to be connected) was introduced. Evidence illegally seized without search-warrant evidence indicating the defendant's connection with a burglary at another time and placewas admitted. The trial was fundamentally unfair.
The conviction should be reversed, and the case remanded for the accused's pre-trial on the offense with which charged and in accordance with normal American standards of justice and due process.
I therefore respectfully dissent.
BARHAM, Justice (dissenting).
After the State had put on its evidence concerning the rape of the prosecuting witness by this defendant, it then presented evidence of other crimes allegedly committed by the defendant. The question *404 of the admissibility of the evidence attempting to connect the defendant with other offenses is raised in several bills of exception.
My own finding of the facts shown by the evidence of these other acts is not wholly in accord with that of the majority, but these differences do not influence my view that the testimony and other evidence of these offenses, received over objection, are inadmissible in this prosecution for aggravated rape.
In one of these other incidents, the State offered evidence that a man entered the bedroom of a seven-year-old girl in the nighttime and removed part of her clothing. A wallet and some papers left at the scene connected the defendant with this offense.
In another incident, the bedroom of a young lady named Biondo was entered in the nighttime by a man who threatened to kill her and offered her money to have sexual intercourse with him but who fled when she threatened to scream. She was not able to identify the defendant as this intruder. In an attempt to link this offense to the defendant, the State introduced in evidence a jacket, stolen from the Biondo house in a burglary several weeks later, which was discovered in the defendant's home.
I have dissented before from this court's extension of the rule which permits the proof of other offenses in order to establish knowledge, intent, and purpose. My concern in State v. Crook, 253 La. 961, 221 So.2d 473, was replaced with consternation in State v. Bolden, 257 La. 60, 241 So.2d 490, where the majority held admissible to show present intent evidence of a rape two years before the offense charged. My concern and consternation have turned into dismay at the majority's broad, sweeping language here of what the law is in respect to intent in the State of Louisiana.
In the knowledge, intent, and purpose cases the court has repeatedly noted that R.S. 15:444 states that some offenses are crimes by reason of violation of the statute, and that no further proof of intent is required than that the accused voluntarily did the act. It has noted repeatedly that where specific intent, guilty knowledge, or scienter is an essential ingredient of the crime, under R.S. 15:445 and 446 prior and subsequent offenses may be used in order to prove this necessary and essential ingredient, intent or guilty knowledge. Here in order to admit evidence of other offenses the court has said that every crime defined by any statute requires proof of intent. What the majority overlooks is that if the State can use other crimes to prove intent, intent has been made an essential element of every crime; that in the future the State is burdened with the obligation, in every prosecution under any statute, of proving intent even when intent is obviously not an essential ingredient of the crime.
Title 15 of the Revised Statutes, Chapter 2, Evidence, Part 4, Knowledge and Intent, consists of three sections: R.S. 15:444, 445, and 446. The majority has taken R.S. 15:445 out of context, but even out of context it does not justify the finding made. But when it is read in context with the preceding and following sections, the purpose of the Legislature in regard to proof of knowledge and intent is clear and is not in accord with the finding made by the majority. The following statement of law from the majority opinion is erroneous. Moreover, the consequences to and the effect upon criminal justice which will result if this is to be accepted as a correct statement of law are catastrophic. Read carefully:
"* * * The intent which is pertinent here is general criminal intent which exists `when the circumstances indicate that the offender, in the ordinary course of human experience must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.' It is distinguished from specific intent in that specific intent requires *405 proof that the consequence was intended; whereas, in crimes where no specific intent is required it is only necessary to prove the `act' was intended.
"Intent, therefore, is a revelant consideration in any `act' producing `criminal consequences,' even though there was no specific intent that criminal consequences would follow. * * *"
After quoting R.S. 15:441 and 445, the majority goes on: "* * * This authority permits, as the trial judge ruled, the activity of this accused involving the seven-year-old girl and the Biondo teenager to be shown in order to dispel any inference that his actions with the victim Janice Wallace were not his voluntary acts that is, similar acts were relevant to show the accused was no stranger to such actions and was, therefore, not forced into the main action, or insensible of its occurrence. In short, the similar occurrences help to establish that the `act' complained of was willed or intended. Added to this is the legal presumption which our law supports that the defendant intended the natural and probable consequences of his act. La.R.S. 15:432. Evidence to support this presumption of intent is also relevant. See La.R.S. 15:441."
It is apparent that there is a difference of opinion as to the distinction between specific and general intent. I hold the view that it is a most important consideration in numerous criminal trial determinations to clearly define and differentiate the two grades of intent. The majority's conclusion here that general intent is the intent anticipated by R.S. 15:446 leads to what I believe is error. See dissent in State v. Schoonover, 252 La. 311, 211 So.2d 273; see R.S. 14:8, 9, 10, and 11.
Prior to the holding in this case the majority of this court (although it has never been stated in opinions) has rationalized from the bench in argument that the intent required by the responsive verdict "attempted aggravated rape" supplied the ingredient of specific intent which allowed evidence of other offenses in aggravated rape cases. Now the majority has discarded the absolute requirement in the law (R.S. 15:446) that intent be an essential ingredient of the crime before other offenses may be used to establish intent, by saying that every offense named by the State of Louisiana makes intent an essential ingredient.
While I remain convinced of the errors of overextension of the k.i.p. exception, and skeptical of the rule laid down by this court in the face of our positive statutory law, I said in State v. Spencer, 257 La. 672, 243 So.2d 793 (armed robbery), that I would accept the majority view in order to become an effective organ of this court. I am the author of a majority opinion, handed down today, in which the court upholds the admission in a prosecution for aggravated rape of evidence of a prior attempted rape and a subsequent rape. See State v. Smith, 259 La. 515, 250 So.2d 724. I was able to write the opinion by applying what I believed to be the majority view (although I personally hold a contrary view) that where attempt to commit the crime is a responsive verdict, intent is an essential ingredient of the actual offense charged. I could not have written that decision if I had believed the statement presented in this opinion represents the majority view of the court on the intent requirement.
Here the legal reasoning for the majority's holding in this particular is erroneous. Moreover, even though I may accept the proposition that evidence of other "similar" acts or offenses is admissible to show intent, it is my opinion that the evidence of the other offenses in the instant case is inadmissible. The first offense (that connected with the seven-year-old girl) cannot be considered a similar offense because there was no likeness in the method used, the approach made, or the act engaged in. It could be considered similar only to the extent that it, like the aggravated rape for which the defendant was being tried, was sexually motivated; *406 but sexual motivation could not supply the intent to commit aggravated rape if intent were essential. Evidence of the second offense (the intrusion into the Biondo home for sexual purposes) is totally irrelevant here because no connection was ever established between this offense and the defendant. The fact that a connection was shown between the defendant and an article of clothing stolen from this house several weeks later does not link the defendant to the earlier intrusion into this home. Moreover, no evidence of the burglary with which this coat was connected was admissible on the trial of this defendant for rape, for that burglary involving a theft is not an act or offense similar to rape or one that would supply intent to commit rape.
The admissibility of all the evidence surrounding the events connected with the Biondo house has never been questioned by the majority on the important bases of no identification of defendant with the first intrusion and total lack of similarity of the second intrusion, the burglary. A correct holding in this regard would pretermit a consideration of the next bill.
Defendant's Bill of Exception No. 9 points up cogently my previous concern that if evidence of other offenses is admissible to prove knowledge, intent, and purpose in a particular prosecution, due process would require prior notice to the defendant of intention to use such evidence so that he could adequately prepare his defense. This bill addresses itself to the lack of a search warrantnot in obtaining evidence for the present prosecution, but rather in obtaining evidence in one of the other alleged offenses. Naturally the defendant could not and did not file a motion to supprss the evidence, which was not connected with the crime for which he was to be tried and which he had no notice would be introduced. The majority, citing Code of Criminal Procedure Article 703, notes that a motion to suppress was not made prior to trial, and that no argument was made that defendant was unaware of the allegedly unconstitutional search and seizure until the trial was in progress. The defendant may, as the majority suggests, have been aware that the jacket was unconstitutionally seized, but he could not have been aware that it would be used in evidence against him on his trial for aggravated rape of a woman who had not the remotest connection with the Biondo house. I certainly hope that we are not going to hold that defendant and counsel are presumed to know the State intends to use evidence which has been seized in investigation of other crimes. The defendant through counsel repeatedly objected to the introduction of the peacoat in evidence, and these objections and the reserved bill of exception before the jury are sufficient here to preserve his right to challenge the constitutionality of the seizure.
The majority then says that there is doubt that "we should overrule the trial judge on his fact determination that a search warrant had issued and was lost". The trial judge did not rule that a search warrant had issued and been lost; he refused to rule. All of the testimony on this issue and the colloquy between counsel and the court were heard in the presence of the jury, and the judge absolutely abdicated his judicial obligation under Code of Criminal Procedure Article 703 to determine the constitutionality of the search and seizure. To the contrary, he left that "judge" question for a determination by the jury, and devoted almost two pages of his charge to the jury to a statement of the law in connection with search warrants and the use of parol evidence to prove a lost instrument.
Next the majority says there is doubt of the validity of this bill because the constitutionality of the seized evidence was not raised when the pea jacket had previously been identified in connection with the Biondo daughter's testimony. The defendant was not upon notice that the State intended to use evidence of a totally unrelated offense; he was not on notice that the evidence might have been the subject *407 of an unconstitutional search and seizure, and he could not have discovered this through a pre-trial motion to suppress evidence in connection with the accusation for which he was tried. In order that there may be compliance with the procedures delineated under Code of Criminal Procedure Article 703 when the State intends to use evidence of prior and subsequent offenses of a similar nature to establish k.i.p., the due process requirement of notice which I have repeatedly proposed is most essential. I urge this court to set the appropriate guidelines for the offering of such evidence. See State v. Spreigl, 272 Minn. 488, 139 N.W.2d 167; State v. Billstrom, 276 Minn. 174, 149 N.W. 2d 281.
The majority has said that if it were error to introduce evidence that the jacket was found in defendant's home, this was harmless error. I will not here repeat my previously stated strong convictions about this court's attempt to apply the federal harmless error rule in Louisiana. See my dissents in State v. Hopper, 253 La. 439, 218 So.2d 551, and State v. Anderson, 254 La. 1107, 229 So.2d 329, and my concurrences in State v. McGregor, 257 La. 956, 244 So.2d 846, and State v. Mixon, 258 La. 835, 248 So.2d 307.
In addition to the objections already expressed in those opinions, I must state that in this decision the majority has found that intent is an essential element of the crime, and that introduction of evidence of other offenses was a means of proving that element. The evidence of the other offenses, including the peacoat (if not inadmissible for other reasons), could have been admissible only to establish k.i.p. The majority does not find in its review for harmless error that intent was established by any other testimony or evidence. The peacoat could not establish the defendant's guilt; it could establish, even under the majority's holding, only one element of all the elements that had to be proved in order to constitute his guilt of the crime charged.
If harmless error can be determined in the face of the constitutional violation before us and upon a consideration of the record as the majority would view it, then the majority must find that other evidence overwhelmingly establishes the necessary ingredient intent. The majority's finding that the record is replete with identification of the defendant is totally irrelevant to a consideration of whether the peacoat had any effect upon the jury in finding the majority's requisite intent.
I respectfully dissent.
NOTES
[1] La.Code Crim.P. art. 703:

"A. A defendant aggrieved by an unconstitutional search or seizure may move to suppress for use as evidence at the trial on the merits, any tangible objects or other property, or documents, books, papers or other writings, on the ground that they were so obtained. A motion filed under the provisions of this paragraph must be filed no later than three judicial days before the trial on the merits begins, unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion. The court in its discretion may permit the filing of such a motion to suppress at any time before or during the trial.
"B. A defendant may move to suppress for use as evidence at the trial on the merits a written confession or written inculpatory statement, on any ground that would make it inadmissible as evidence. Such a motion to suppress must be filed no later than three judicial days before the trial on the merits begins, and shall be heard and decided by the court prior to trial.
"A ruling prior to trial on the merits, upon a motion to suppress a written confession or written inculpatory statement is binding at the trial on the merits. However, a failure to file prior to the trial on the merits a motion to suppress a written confession or written inculpatory statement does not prevent the defendant from objecting to the admissibility thereof at the trial on the merits, and a ruling made adversely to the defendant prior to the trial on the merits upon a motion to suppress a written confession or written inculpatory statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of a written confession or written inculpatory statement for the purpose of enabling the jury to determine the weight to be given to it.
"When a ruling on a motion to suppress is adverse to the defendant, the state shall be required prior to presenting the written confession or written inculpatory statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the written confession or written inculpatory statement for the purpose of enabling the jury to determine the weight to be given to it.
"C. On the trial of a motion to suppress filed under the provisions of this article the burden of proof is on the defendant to prove the grounds of his motion except that the state shall have the burden of proving that a purported written confession or written inculpatory statement was made freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
[1] The victim awoke in her bedroom to find the assailant in her bed. The only lighting was provided by the dim flicker through the grates of a floor gas-heater beyond the foot of the bed.
[2] This apparently precipitated his arrest and being charged with other unsolved sexual crimes in the area.
[3] E. g.: the assailant was clothed, while in the Wallace incident the assailant had taken off his clothes before he awakened the victim; the college-girl's assailant offered money, while the Wallace one did not.