ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. While driving his motorcycle to Meridian, Mississippi, on July 19, 2007, Kerry Smith was hit by a truck driven by the defendant, Greg McDonald. As a result of the collision, Smith suffered numerous injuries. McDonald was subsequently tried and convicted in the Circuit Court of Lauderdale County of DUI Maiming in violation of Mississippi Code Annotated section 63-11-30(5) (Supp.2009). He now appeals his conviction and argues that: (1) the trial court erred in denying his motion for a new trial, and (2) the trial court erred in denying his motions for mistrial. Finding no merit to the issues raised by McDonald, we affirm his conviction and sentence.
 

 FACTS
 

 ¶ 2. On July 19, 2007, Smith was riding his motorcycle on Highway 19 from Col-linsville, Mississippi, to Meridian, Mississippi, to eat dinner. It was approximately 5:30 p.m., and according to Smith’s testimony, it was still bright outside. Frank Knight Jr. testified that he saw McDonald on his motorcycle at approximately 5:30 p.m. to 6:00 p.m. while McDonald was traveling south on Highway 19. Smith turned east onto State Boulevard Extension and did not see any other vehicles on the road until he noticed a black extended cab GMC coming from the opposite direction. At this point in time, Smith was traveling approximately fifty to fifty-five miles per hour. Smith stated that he had been riding motorcycles all his life, and because of his experience, he was on guard as the truck approached him. At first the truck was driving straight, but then it seemed to slow down and veered slightly toward the centerline of the road. When the truck briefly crossed over the center-line, Smith decelerated and readied himself to quickly apply the motorcycle’s brakes.
 

 ¶ 3. Smith stated that there were no crossroads or other possible turnoffs in
 
 *25
 
 that area of State Boulevard Extension. However, he stated that occasionally some individuals would pull onto the grass to fish on the bank of Okatibbee Creek. He explained that the turn leading to the bank was on his right side as he traveled down State Boulevard Extension that day. At this point, the black GMC veered back into the proper lane. Smith stated that he was still unsure of the driver’s intention but assumed that the driver saw him. Smith decided to stay in his lane and pass by the truck as it had slowed considerably, and Smith stated that he believed the driver was looking for the turnoff for the Okatib-bee Creek. Smith testified that at this point he was traveling at approximately forty miles per hour. Additionally, he stated that he had shifted slightly right in his lane to give the black GMC more room because Smith was still not completely sure of the driver’s intentions.
 

 ¶ 4. Smith testified that, without warning, the driver of the black GMC “gassed it” and turned left into Smith’s lane. Smith applied his motorcycle’s front brakes as hard as he could, which caused the motorcycle’s rear tire to come off the ground.
 
 [1]
 
 However, Smith’s counter-measures were to no avail, and he hit the left front end of the truck. Smith testified that the truck was occupying approximately half to two-thirds of his lane and at approximately a forty-five-degree angle to his motorcycle at the time of the collision.
 

 ¶ 5. Smith recounted what occurred at the moment of impact as follows:
 

 Because that lovely slag asphalt that we have [it] tore me to pieces. And I’d like to back up and say that on the moment of impact, the handlebars torqued [sic] when I hit the front end of the truck, and the left handlebar actually hit my left leg, ran up my leg; and the bar end — the outer edge of the handlebar penetrated all the way down to my femur bone and took a plug of tissue out where my — my femur actually broke the handlebar off the bike. And that’s when — as I was being thrown into the air.
 

 [[Image here]]
 

 I — I think — based on the penetrating wound to my left leg, it kind of helped to catapult me over, and I believe I landed — I did a complete flip in the air because I had extensive trauma to my right shoulder. My clavicle was crushed, and I actually had bone fragments hanging out of myself [sic] shoulder, exposed bone fragments. And then as I flipped over, I hit on my back, and then I just went to tumbling because I had road rash — extensive road rash down my right side, my hip. I had both arms, both elbows, both knees. And my helmet actually had road rash all the way across from the left side all the way across to the right side.
 

 Smith finally came to rest in the grass to the right side of the direction he was traveling. Several individuals stopped when they noticed an accident had occurred. One of the bystanders called 911. Smith stated that he was not under the influence of alcohol or other stimulants or otherwise impaired in any way at the time of the accident.
 

 ¶ 6. Ás luck would have it, one passerby was the Sheriff of Lauderdale County, Sheriff William Sollie. While off duty, he was traveling west on State Boulevard Extension at approximately 6:30 p.m. and saw that there had been an accident. Although
 
 *26
 
 no other law enforcement officers were at the scene when he arrived, Sheriff Sollie did notice that some medical personnel were present.
 
 [2]
 
 The medical personnel were assisting Smith who was lying on the side of the road. Sheriff Sollie also saw a truck parked on the dirt road leading to Okatibbee Creek. Sheriff Sollie stated that “[t]he debris trail from the motorcycle led from about where the pickup truck was parked further east on State Boulevard ending with the motorcycle being in a ditch on the south side of State Boulevard some 30 yards away from the pickup truck.”
 

 ¶ 7. Sheriff Sollie questioned the crowd that had formed for the identity of the driver of the truck. McDonald identified himself as the driver. Sheriff Sollie testified that based upon his observations of McDonald during the conversation that subsequently ensued, his opinion was that McDonald was under the influence of alcohol. These observations included: difficulty in finding and removing his license from his wallet, unable to stand without periodically using his truck to support himself, and slurred speech. Additionally, Sheriff Sollie noticed the smell of alcohol coming from McDonald. Sheriff Sollie handcuffed McDonald shortly before on-duty law enforcement officers arrived. He subsequently left the scene of the accident.
 

 ¶ 8. Deputy David McCarra was one of the on-duty sheriffs deputies at the scene of the accident. He worked for the Lauderdale County Sheriffs Department at the time of the accident and was also a DUI officer for the sheriffs department. Deputy McCarra testified that the DUI training he had received included: certification on the Intoxilyzer 8000, attending field sobriety schools, being an instructor for the state at sobriety schools, and attending Sobriety Trained Officers Representing Mississippi conferences. When Deputy McCarra arrived, Sheriff Sollie took his handcuffs off McDonald and handed McDonald’s driver’s license to Deputy McCarra. Deputy McCarra then read McDonald his
 
 Miranda
 
 rights. Deputy McCarra testified that: “It was obvious to me that [McDonald] was intoxicated. There was a strong smell of an alcoholic beverage coming from his body. As I spoke to him, there was a strong smell of burned marijuana from his breath and his clothing.... His speech was extremely slurred.”
 

 ¶ 9. Deputy McCarra escorted McDonald to the sheriffs department. After determining that McDonald did not have any physical impairments, Deputy McCarra administered several field sobriety tests once he and McDonald arrived at the sheriffs department. Specifically, Deputy McCarra administered the horizontal-gaze-nystagmus test, the walk-and-turn test, and the one-legged-stand test. Deputy McCarra testified that McDonald showed six out of eight signs of impairment on the walk-and-turn test. Additionally, he testified that McDonald could not complete the one-legged-stand test at all. At this point McDonald was offered the opportunity to take the Intoxilyzer 8000 test, but he refused. When asked if, in his opinion, McDonald was under the influence at the time, Deputy McCarra stated, “Absolutely ... Yes. He was definitely impaired.”
 

 ¶ 10. Deputy Odell Hampton received the call from dispatch at 6:22 p.m. informing him that an accident had occurred, and he arrived at the scene at 6:88 p.m. When he arrived, Sheriff Sollie and Deputy McCarra were already at the scene of the accident. McDonald was still at the scene;
 
 *27
 
 however, Smith had already been transported to the-hospital. Deputy Hampton was approximately two steps from McDonald when he first arrived at the scene, and he smelled alcohol coming from McDonald. Deputy Hampton searched McDonald’s truck and found empty beer cans on the floorboard of the passenger’s side. However, he did not inspect the beer cans further and could not testify whether there were signs that the beverages had been recently consumed. In his report of the accident, Deputy Hampton noted that he approximated that the final resting spot for the motorcycle was fifty feet from the final resting spot of the truck, and he noted that McDonald’s truck had damage to the front left quarter (driver’s side) of the truck.
 

 ¶ 11. Fourteen months after the accident, the Lauderdale County District Attorney’s Office requested that the Mississippi Highway Patrol conduct an accident reconstruction. Corporal Jason Walton conducted the reconstruction and testified as an expert during McDonald’s trial.' In forming his opinion, Corporal Walton viewed the scene of the accident, discussed the facts of the accident with Sheriff Sollie, viewed photographs that were taken by Smith of Smith’s motorcycle and McDonald’s truck, and assessed the damage to both vehicles. He opined that the truck and motorcycle were traveling in opposing directions and the truck turned to its left immediately before angularly impacting the motorcycle. He further stated that the collision occurred in the eastbound lane, the lane in which Smith was traveling. Additionally, Corporal Walton stated that the damage to the motorcycle indicated that it was moving to the right at the time of the collision. During cross-examination, Corporal Walton stated that he. did not have all the information he needed to make a complete reconstruction of the accident.
 

 ¶ 12. After the State- rested its case in chief, McDonald chose to remain silent and did not testify.
 

 PROCEDURAL HISTORY
 

 ¶ 13. McDonald was indicted of DUI Maiming. McDonald was initially indicted under section 63-11-30(4) in November 2007. However, on March 13, 2009, the trial court granted the State’s motion to amend the indictment to reflect section 63-11-30(5) as subsection (4) appeared to be a scrivener’s error. His trial was subsequently held on March 23-25, 2009. McDonald was found guilty of DUI Maiming and sentenced to twenty years in the custody of the Mississippi Department of Corrections, thirteen years suspended, with seven years to serve. Further, McDonald was sentenced to serve ten years on post-release supervision, with the first five years served on a reporting basis and the remaining five years served on a non-reporting basis. Lastly, McDonald was ordered to pay a $2,000 fine and restitution to Smith and the Crime Victims’ Compensation Fund of $4,500 and $3,564.80, respectively. McDonald subsequently perfected his appeal.
 

 DISCUSSION
 

 I. WHETHER THE TRIAL COURT ERRED IN DENYING MCDONALD’S MOTION FOR A NEW TRIAL.
 

 ¶ 14. Following McDonald’s sentencing hearing, he moved the trial court for a judgment notwithstanding the verdict or, in the alternative, a new trial. However, the trial court summarily denied McDonald’s motion. On appeal, McDonald argues that the trial court erred in failing to grant a new trial. Specifically, he claims that: the State’s evidence was too weak and tenuous to substantiate the
 
 *28
 
 jury’s verdict; Corporal Walton was unable to find that McDonald was the proximate cause of the accident; and the State did not prove that Smith was permanently maimed or disabled. We find that the weight of the evidence presented to the jury was sufficient to justify a guilty verdict, As such, this issue is without merit.
 

 ¶ 15. A motion for a new trial challenges the weight of the evidence.
 
 Bush v. State,
 
 895 So.2d 836, 844 (¶ 18) (Miss.2005). The standard of review for the trial court’s denial of a motion for a new trial is an abuse of discretion. An appellate court will disturb a verdict only “when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Id.
 
 The reviewing court acts as a “thirteenth juror” and views the evidence in the light most favorable to the verdict.
 
 Id.
 
 All “evidence consistent with the defendant’s guilt is accepted as true together with any reasonable inferences that may be drawn from that evidence.”
 
 Young v. State,
 
 891 So.2d 813, 821 (¶ 21) (Miss.2005) (citing
 
 Heidel v. State,
 
 587 So.2d 835, 838 (Miss.1991)).
 

 ¶ 16. McDonald was convicted of DUI Maiming under Mississippi Code Annotated section 63-11-30(5). In order to prevail on such a charge, the State must have proved beyond a reasonable doubt that: (1) McDonald was operating his motor vehicle under the influence of intoxicating liquor, (2) in a negligent manner, (3) and caused mutilation, disfigurement, permanent disability, or destruction of “the tongue, eye, lip, nose[,] or any other limb, organ[,] or member of’ Smith. Mississippi Code Annotated § 63-11-30(1), (5) (Supp. 2009). Therefore, our initial inquiry is whether under our standard of review the evidence presented at trial showed that McDonald was under the influence of alcohol at the time of the accident.
 

 ¶ 17. Sheriff Sollie, Deputy Hampton, and Deputy McCarra all testified that they smelled alcohol while they were in close proximity to McDonald. Further, several empty beer cans were found on the floorboard of the passenger’s side of McDonald’s truck. Both Sheriff Sollie and Deputy McCarra testified that McDonald slurred his speech when he spoke and had difficulty standing without supporting himself. Although McDonald’s blood-alcohol content was never determined because the Intoxilyzer test was refused, Deputy McCarra testified that he administered three field sobriety tests once he and McDonald reached the sheriffs department. Deputy McCarra testified that McDonald failed the one-legged-stand test and exhibited six out of eight signs of impairment during the walk-and-turn test.
 
 [3]
 
 This Court has held that even without results from an Intoxilyzer test, the failure of field sobriety tests, slurred speech, the smell of alcohol, and glazed eyes amount to evidence of intoxication.
 
 Saucier v. City of Poplarville,
 
 858 So.2d 933, 936 (¶ 17) (Miss.Ct.App.2003). As such, viewing the evidence in a light most favorable to the verdict, we cannot say that a finding that McDonald was under the influence of alcohol at the time of the accident is contrary to the overwhelming weight of the evidence.
 

 ¶ 18. McDonald next argues that the jury’s finding that he negligently caused mutilation, disfigurement, permanent disability, or destruction of the tongue, eye, lip, nose, or any other limb, organ, or member of Smith is against the
 
 *29
 
 overwhelming weight of the evidence. The supreme court has held that as used as an element of DUI Maiming, “negligence” means simple negligence rather than gross or culpable negligence.
 
 Holloman v. State,
 
 656 So.2d 1134, 1140 (Miss.1995). The jury was instructed on the definition of negligence, as well as the definition of proximate cause. As to the latter, the trial court instructed the jury that “the proximate cause of an injury is that cause, which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.”
 

 ¶ 19. Smith testified in detail as to the events leading up to the collision. He stated that: McDonald was driving erratically; as he neared McDonald’s truck, McDonald “gassed it” and turned into Smith’s lane of travel; and Smith attempted to avoid the truck to no avail and collided with the front driver’s side of the truck. Corporal Watson’s testimony corroborates Smith’s version of events. Although he admitted that there were several pieces of information that were unknown, his expert opinion was, essentially, that: the two vehicles were traveling in opposite directions; the collision occurred in Smith’s lane of travel after McDonald turned left; and Smith veered .right. We find that the testimony of Smith and Corporal Walton, when accepted as true, establish that McDonald negligently caused the accident and was the proximate cause of the injuries Smith sustained.
 

 ¶ 20. We reach the same conclusion as to whether the weight of the evidence supported a finding that Smith’s injuries constituted disfigurement or mutilation. The trial court instructed the jury as follows:
 

 The Court instructed the Jury that mutilate has been defined as depriving a person of the use of any limb of his body or to cut off or permanently destroy or cripple or to radically alter as to make imperfect. Mutilate has been further defined as it applies to a person to mean to deprive a person of the use of any of those limbs which may be useful to him or her in a fight or to otherwise destroy the use of a limb or organ.
 

 The Court instructs the Jury that disfigure has been defined as that which impairs or injures beauty, symmetry[,] or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner. It has further been defined as to mar the figure and to render less perfect or beautiful in appearance, to deface or deform, to do such permanent injury which may detract from the personal appearance.
 

 During his direct examination Smith detailed the injuries he received as a result of the accident. He stated that he suffered from the following injuries: a compound fracture to his clavicle which was protruding out through the skin, a chro-mioclavicular (AC) separation, road rash from his right shoulder to his right hip, road rash down both legs, broken ribs on his right side, a broken left finger, and a puncture wound to his left thigh which removed a “chunk of meat” from his leg all the way down to his femur. Additionally, as a result of the impact and surgery performed to repair his clavicle, Smith suffers from nerve damage and loss of sensation in his shoulder and arm. He suffers from further nerve damage in his hip and left leg. Smith testified that the nerve damage was still present; he still had a scar from the road rash; and there was a “dip” in his leg now as a result of the puncture wound. Smith’s medical expenses stemming from the injuries caused by the accident totaled $29,807.04. Smith stated that had he not received medical
 
 *30
 
 treatment, his injuries would have been life-threatening.
 

 ¶21. As McDonald points out in his brief, Smith testified that he still occasionally rode motorcycles and was able to carry on with daily life. However, the ability to “carry on” does not prevent a finding that McDonald was maimed as a result of the collision. We find that the jury’s determination that Smith’s testimony as to his injuries and their lasting effects was of such weight and credibility to find that he was maimed or disfigured as defined by the trial court. Therefore, viewing the evidence in the light most favorable to the verdict, we find this issue lacks merit.
 

 II. WHETHER THE TRIAL COURT ERRED IN DENYING MCDONALD’S MOTIONS FOR A MISTRIAL.
 

 ¶ 22. . During Deputy Hampton’s direct examination he was asked what his duties were at the scene of the accident. Deputy Hampton responded as follows: “At the time, I was told to gather information for the report. Lieutenant McCarra had [McDonald’s driver’s] license in hand, and I took the information from that and asked Mr. McDonald what happened, but he had already been Mirandized, and he stated he didn’t have anything to say.” McDonald’s trial counsel immediately moved the trial court for a mistrial. However, after a lengthy discussion outside the presence of the jury, the trial court denied it. At the behest of McDonald’s trial counsel, the trial court did not instruct the jury as' to the error of Deputy Hampton’s comment. Later in the trial, during the direct examination of Deputy McCarra, the State was in the process of asking a series of questions to determine Deputy McCarra’s actions on the scene of the accident and asked: “And then you gave-you read him his
 
 Miranda
 
 warnings, and then what did you do?” Deputy McCarra responded, “I — after I Mirandized him and he said he — he indicated he didn’t want to talk to me — .” At this point, McDonald’s trial counsel objected and again moved the court for a mistrial. The trial court denied the motion.
 

 ¶ 23. An accused has the right to remain silent, guaranteed by the Fifth Amendment to the United States Constitution. Evidence of post-arrest silence is improper because it violates the accused’s right against self-incrimination.
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). McDonald argues that Deputy Hampton and Deputy McCar-ra impermissibly commented upon McDonald’s exercise of his
 
 Miranda
 
 rights. Further, he claims that the trial court erred in denying his motions for a mistrial as a result of the comments as the comments denied him a fair trial. Finally, McDonald argues that the deputies’ statements cannot be deemed harmless error because “the State cannot show that the jury’s guilty verdict was not affected by the deputies[’] impermissible comments.”
 

 ¶ 24. We review motions for a mistrial under an abuse-of-discretion standard.
 
 Tate v. State,
 
 912 So.2d 919, 932 (¶ 41) (Miss.2005). The trial court must declare a mistrial when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant’s case; however, the trial judge is permitted considerable discretion in determining whether a mistrial is warranted since the judge is best positioned for measuring the prejudicial effect.
 
 Id.
 
 (citing
 
 Gossett v. State,
 
 660 So.2d 1285, 1290-91 (Miss.1995)). Further, the supreme court has stated that:
 

 The United States Supreme Court has explained that “a defendant is entitled to a fair trial but not a perfect one,” for there are no perfect trials.
 
 Brown v.
 
 
 *31
 

 United States,
 
 411 U.S. 223, 231, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (quoting
 
 Bruton
 
 [v.
 
 United States
 
 ], 391 U.S. [123,] 135, 88 S.Ct. 1620 [20 L.Ed.2d 476] [(1968)] (quoting
 
 Lutwak v. United States,
 
 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953))). While “there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error,”
 
 Chapman v. California,
 
 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), “most constitutional errors can be harmless.”
 
 Neder v. United States,
 
 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (citing
 
 Arizona v. Fulminante,
 
 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).
 

 The Supreme Court has recognized a limited class of fundamental constitutional errors, “structural errors,” that are not subject to harmless-error analysis and require automatic reversal.
 
 Neder,
 
 527 U.S. at 7, 119 S.Ct. 1827 (citing
 
 Fulminante,
 
 499 U.S. at 309, 111 S.Ct. 1246). However, for all other constitutional errors, reviewing courts must apply harmless-error analysis in order to determine whether the error was harmless “beyond a reasonable doubt.”
 
 Neder,
 
 527 U.S. at 7, 119 S.Ct. 1827 (citing
 
 Chapman,
 
 386 U.S. at 24, 87 S.Ct. 824). “[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.” [Delaware]
 
 v. Van Arsdall,
 
 475 U.S. [673,] 681, 106 S.Ct. 1431 [89 L.Ed.2d 674] [ (1986) ]. Once the constitutional error has been established, the burden is on the State to demonstrate the error is harmless beyond a reasonable doubt.
 
 Fulminante,
 
 499 U.S. at 296, 111 S.Ct. 1246.
 

 Smith v. State,
 
 986 So.2d 290, 300 (¶ 31) (Miss.2008).
 

 ¶ 25. Although the deputies’ statements constituted impermissible comments on McDonald’s right to silence, we cannot say that the statements deprived McDonald of a fair trial or prejudiced him in any way. In each instance, the question asked by the prosecution was not designed to elicit from the witness the fact that McDonald had invoked his right to remain silent. The question appears to have been an innocent one. The trial court gave McDonald’s counsel the option of instructing the jury to disregard any comment by the witness that McDonald chose not to answer the officers’ question and then poll the jury to determine if each juror would follow the court’s instructions. Defense counsel declined the court’s invitation. The trial court was in the best position to determine and gauge whether the answers given prejudiced McDonald’s right to a fair trial. We see no justification to interfere with the trial court’s decision. The supreme court has stated that “even errors involving a violation of an accused’s constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming.”
 
 Riddley v. State, 777
 
 So.2d 31, 35 (¶ 12) (Miss.2000). In this case, we find the evidence against McDonald quite, strong and under the circumstances of this case, any error resulting in unsolicited answers to generic questions is quite harmless.
 

 ¶ 26. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF DUI MAIMING AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH THIRTEEN YEARS SUSPENDED, SEVEN YEARS TO SERVE, AND TEN YEARS OF POST-RELEASE SUPERVISION,
 
 *32
 
 WITH THE FIRST FIVE YEARS REPORTING AND THE REMAINING FIVE YEARS NON-REPORTING, AND TO PAY A $2,000 FINE AND RESTITUTION TO SMITH AND THE CRIME VICTIMS’ COMPENSATION FUND OF $4,500 AND $3,564.80, RESPECTIVELY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAUD-ERDALE COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.
 

 [1]
 

 . Smith testified that he did not think he was skidding at the time of the collision.- He stated that has he only applied the motorcycle’s rear brakes, he most likely would have begun to skid. However, because of his training and experience in riding motorcycles, he knew not to apply the rear brakes.
 

 [2]
 

 . Sheriff Sollie called the dispatch office from his cell phone to inform them of the accident and request emergency services and law enforcement personnel. However, when he called, he was informed that the accident had already been reported.
 

 [3]
 

 . Presumably, the State did not elicit the results of the horizontal-gaze-nystagmus test from Deputy McCarra as the test has been held inadmissible to prove intoxication or impairment.
 
 Young v. City of Brookhaven,
 
 693 So.2d 1355, 1360-61 (Miss.1997).